**Morton SOBELL, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**No. 66 Civil 1328.**

United States District Court
S. D. New York.

Feb. 14, 1967.

**580**

Marshall Perlin, William M. Kunstler, Arthur Kinoy, New York City, Malcolm Sharp, University of New Mexico Law School, Albuquerque, N. M., Benjamin B. Dreyfus, San Francisco, Cal., Vern Countryman, Lexington, Mass., for petitioner.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, New York City, for the United States, Robert L. King, Stephen F. Williams, Asst. U. S. Attys., of counsel.

## OPINION

WEINFELD, District Judge.

Petitioner, Morton Sobell, moves pursuant to 28 U.S.C. section 2255, to vacate and set aside a judgment of conviction entered upon a jury verdict returned in March 1951, under which he is now serving a thirty-year term of imprisonment.

Petitioner was tried and convicted together with Julius and Ethel Rosenberg upon an indictment which charged that they, together with David Greenglass, Anatoli A. Yakovlev and others to the grand jury unknown, had conspired from June 1944 to June 1950, in violation of the Espionage Age of 1917,[1] to communicate to the Soviet Union documents, writings, sketches, notes and information relating to the national defense of the United States with the intent that they be used to the advantage of the Soviet Union. Named as conspirators but not as defendants were Ruth Greenglass, the wife of David Greenglass, and Harry Gold. The indictment was severed as to Greenglass and also as to Yakovlev, an official attached to the Soviet Embassy, who had left the United States prior to the return of the indictment.

Greenglass pleaded guilty before the start of the trial. The principal testimony as to the conspiracy came from Greenglass, his wife and Harry Gold. After trial Greenglass was sentenced to a term of fifteen years. Gold, at the

---

1. 50 U.S.C. § 32(a), 40 Stat. 218 (1917), which was recodified in 1948 as § 794(a) and (b) of Title 18, 62 Stat. 737.

time of trial, was serving a thirty-year sentence imposed upon his plea of guilty in the District Court of Pennsylvania to an indictment charging him and Dr. Klaus Fuchs with conspiracy to violate the Espionage Act. Gold's testimony involved Fuchs, a British scientist, in the conspiracy charged in the instant indictment. The Rosenbergs took the witness stand. The petitioner did not testify.

The evidence of petitioner's participation in the conspiracy came principally from Max Elitcher, a college classmate of both petitioner and Julius Rosenberg. Elitcher, who within the indictment period worked in the Navy Department and later in national defense plants engaged in classified projects, testified in substance that petitioner and Rosenberg had attempted to secure from him classified antiaircraft and fire control information for the Soviet Union, and had urged him not to leave his Navy Department job because he could be valuable there in espionage. Elitcher also testified that Sobell had in his possession material contained in a 35 millimeter film can described by Sobell as valuable information, and that he accompanied Sobell on the occasion of its delivery to Rosenberg. In addition, to establish consciousness of guilt, the government introduced evidence that petitioner fled to Mexico with intent not to return, and that the flight followed an escape pattern urged by Rosenberg upon the Greenglasses. The jury was instructed that if they disbelieved Elitcher they were to acquit the petitioner.

The petitioner's present charges are directed not against Elitcher, but the testimony of Harry Gold, David Greenglass and John Derry, another government witness, and exhibits in evidence— in broadest terms that the "government * * * knowingly created, contrived and used false, perjurious testimony and evidence and intentionally and wilfully induced and allowed government witnesses to give false, misleading and deceptive testimony in order to obtain the conviction of petitioner and his co-defendants." The "government," according to petitioner, is all-encompassing and includes "the prosecutive, investigative and other agencies of the United States and their agents or employees, as well as all those acting with its knowledge and at its behest, involved in the investigation and prosecution of this case."

Petitioner previously attacked his conviction upon direct appeal[2] and in five separate collateral proceedings, either under the Federal Rules of Criminal Procedure or section 2255 of Title 28, all of which failed.[3] In the consideration of the charges here made the court has read the entire lengthy trial transcript, including the testimony of witnesses who are not impugned; also the various post-trial petitions by petitioner and those of his codefendants in which he joined, and the trial and appellate records of those proceedings.

2. United States v. Rosenberg, 195 F.2d 583 (2d Cir.), rehearing denied, 195 F.2d 609 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, rehearing denied, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 652 (1952), leave to file a second petition for rehearing denied, Sobell v. United States, 347 U.S. 1021, 74 S.Ct. 860, 98 L.Ed. 1142 (1954), motion to vacate orders denying certiorari and rehearing denied, 355 U.S. 860, 78 S.Ct. 91, 2 L.Ed.2d 67 (1957).

3. See United States v. Rosenberg, 108 F. Supp. 798 (S.D.N.Y.), aff'd, 200 F.2d 666 (2d Cir. 1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384, rehearing denied, Sobell v. United States, 345 U.S. 1003, 73 S.Ct. 1131, 97 L.Ed. 1408 (1953); United States v. Rosenberg, 109 F.Supp. 108 (S.D.N.Y.), aff'd as to Rosenbergs, 204 F.2d 688 (2d Cir. 1953), aff'd as to Sobell, Oct. 8, 1953, Docket No. 22885, cert. denied, Sobell v. United States, 347 U.S. 904, 74 S.Ct. 428, 98 L. Ed. 1063 (1954); United States v. Sobell, 109 F.Supp. 381 (S.D.N.Y.1953); United States v. Sobell, 142 F.Supp. 515 (S.D. N.Y.1956), aff'd, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957), rehearing denied, 355 U.S. 920, 78 S.Ct. 338, 2 L.Ed.2d 280 (1958); United States v. Sobell, 204 F. Supp. 225 (S.D.N.Y.1962), aff'd, 314 F. 2d 314, cert. denied, 374 U.S. 857, 83 S. Ct. 1906, 10 L.Ed.2d 1077 (1963).

The petitioner contends that in none of the prior proceedings were the issues here presented raised, and that some of the facts now relied on were not available until after 1963 and others not until July 1966. The government, to the contrary, asserts that the present proceeding is a repetition of charges previously heard and determined on the merits and petitioner's application should be denied under section 2255, which provides that the "court shall not be required to entertain a second or successive motion for similar relief." [4] Finally, the government urges that the records and files of this court not only show petitioner is not entitled to relief, but that his application is a flagrant abuse of section 2255 because it is totally groundless and because of failure to allege previously facts known or which with due diligence should have been known to him at the time of trial and on his various post-conviction applications.[5] Whatever the merits of these respective contentions, petitioner's charges must be considered.

Cutting through the highly repetitious, voluminous, argumentative and conclusory allegations in this present application, the nub of petitioner's claim that he was denied a fundamentally fair trial is twofold: (1) that the prosecution by various means created in the minds of the court, jury and defense the false impression that Exhibit 8, a sketch, and testimony with respect thereto contained the secret and principle of the atomic bomb dropped at Nagasaki; (2) that the government knowingly permitted Harry Gold and David Greenglass to give perjurious testimony as to meetings between them on June 3, 1945 at Albu-querque, New Mexico, and corroborated this perjury through a forged hotel registration card, Exhibit 16. We consider each claim separately.

■ A preliminary observation is in order. The constant repetition through the petition's 100 paragraphs of allegations of fraud, perjury, concealment of evidence and like epithets, and the "upon information and belief" charges make it desirable to state what ordinarily would be assumed—that reiteration of unsupported charges and conclusory allegations is no substitute for factual allegations.[6]

## I. THE EXHIBIT 8 CLAIMS

Exhibits 2, 6, 7 and 8, which represent the atomic information Greenglass testified he turned over for transmission to the Soviet Union, were the subject of petitioner's first section 2255 motion brought on in November 1952. In order properly to evaluate the current charges centering about Exhibit 8, the trial testimony with respect to and the former attack upon all the exhibits must be considered.

### The Trial Testimony

Greenglass was a high school graduate and had for limited periods attended Brooklyn Polytechnic and Pratt Institutes. After his induction into the Army, he was stationed, commencing in August 1944, at the Los Alamos project, New Mexico, where atomic bomb experimentation was being carried on and the most stringent security regulations were in effect. His particular experience was as a machinist and he was assigned to a machine shop in a group concerned with

4. Sanders v. United States, 373 U.S. 1, 15–17, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Price v. Johnston, 334 U.S. 266, 287–289, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948).

5. Sanders v. United States, 373 U.S. 1, 17–19, 68 S.Ct. 1049 (1963); Price v. Johnston, 334 U.S. 266, 289–292, 68 S.Ct. 1049 (1948). See also Latham v. Crouse, 347 F.2d 359, 360 (10th Cir. 1965).

6. Sanders v. United States, 373 U.S. 1, 19–22, 83 S.Ct. 1068 (1963); Machibroda v. United States, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); United States ex rel. McGrath v. LaVallee, 319 F.2d 308, 312 (2d Cir. 1963); United States v. Mathison, 256 F.2d 803, 805 (7th Cir.), cert. denied, 358 U.S. 857, 79 S.Ct. 77, 3 L.Ed.2d 91 (1958); United States v. Pisciotta, 199 F.2d 603 (2d Cir. 1952); United States v. Sturm, 180 F.2d 413, 414 (7th Cir.), cert. denied, 339 U.S. 986, 70 S.Ct. 1008, 94 L.Ed. 1388 (1950).

high explosives, headed by Dr. George B. Kistiakowski, and subsequently became foreman of the shop. His work consisted of machining various apparatus required in connection with experimentation on atomic energy, including a flat type lens mold and other molds then the subject of experimentation by Dr. Walter S. Koski.

Greenglass testified that while stationed at Los Alamos he became a member of the conspiracy in November 1944 at the instigation of the Rosenbergs, and that his activities extended to obtaining and transmitting classified information to them concerning experiments, locations, personnel, security measures and the nature of the camouflage at the project. Exhibit 2 was a replica of a sketch of an explosive lens mold used in atomic bomb experiments at Los Alamos which he had prepared and delivered to the Rosenbergs, together with descriptive material and a full report of the experiments, as well as the names of scientists working there, in January 1945 while in New York City on a furlough.

Greenglass also testified that Exhibits 6 and 7 were schematic replicas of sketches of lens molds, one shown in an experimental setup which, together with a report on atomic experimentation, he delivered to Harry Gold on June 3, 1945 at Albuquerque, New Mexico. These exhibits he said were prepared from memory, Exhibits 2 and 7 during the trial, and Exhibit 6 at the time of his apprehension in June 1950.

After Greenglass had testified as to these exhibits he was excused and Dr. Koski was called. Dr. Koski testified that he was a professor of physical chemistry, a consultant in nuclear physics, and an engineer at the Los Alamos laboratory from 1944 to 1947, associated with implosion research connected with the atomic bomb; that all work at Los Alamos was of a highly classified and secret nature; that Exhibits 2 and 6 were substantially accurate replicas of sketches he had made and submitted to the

shop where Greenglass worked; that Greenglass had access to the information shown on those exhibits; that Exhibit 7 was a rough sketch of an experimental setup for studying cylindrical implosion; that the sketches and information which Greenglass testified he had given in connection therewith were reasonably accurate descriptions of the experiments and their details as he, Dr. Koski, knew them at the time.

Dr. Koski also testified that knowledge of his experiments would have been to the advantage of a foreign nation; that his experiments were in a new and original field. He further testified that one familiar with the field could ascertain from Exhibits 2, 6 and 7 the principle and idea of the lenses and the nature and the object of the activities then under way at Los Alamos in relation to the production of the atomic bomb. Dr. Koski was not cross-examined by petitioner's counsel, although the Rosenbergs' counsel did inquire.

Following Dr. Koski's testimony Greenglass resumed the witness stand. Preliminarily he testified that in January 1945 Rosenberg had described a bomb (which he subsequently learned was the type dropped on Hiroshima) so that he, Greenglass, would know what to be on the lookout for; that thereafter he met persons at Los Alamos who worked in different units of the project, others who talked of the bombs, how they operate, and that he himself worked directly on certain apparatus that went into an atomic bomb. Greenglass further testified that in September 1945, while on furlough in New York City, he told Rosenberg he thought he had "a pretty good description of the atom bomb,"[7] whereupon, at Rosenberg's request, he drew and delivered to the Rosenbergs a sketch of a cross-section of an atomic bomb and about twelve pages of descriptive material. Exhibit 8, he testified, was a replica of that sketch. When the government offered it in evidence, counsel for petitioner's codefendants, the

---

7. Record, p. 490.

Rosenbergs, immediately moved to impound the exhibit; petitioner's counsel acquiesced in this request, and subsequently, after the exhibit was shown to the jury, it was impounded. The prosecution then asked Greenglass to state what was contained in the written material which accompanied the sketch. Before Greenglass could answer, the Rosenbergs' counsel stated he was prepared to stipulate that the sketch and twelve-page description were secret, confidential and concerned the national defense; however, Sobell's counsel refused. Thereupon, with the consent of all counsel, Greenglass' testimony with respect to Exhibit 8 and the descriptive material, which relates to the component parts, mechanism and operation of an atomic bomb, was received in camera, although the press was permitted to remain,[8] as were representatives of the Atomic Energy Commission.

John A. Derry, an electrical engineer, also testified as to Exhibit 8. Derry was assigned to the Manhattan District Project from December 1942 to August 1946 and was liason officer between General Groves, Commanding General of the entire Manhattan Project, and the Los Alamos laboratory. His duties required him to keep General Groves informed of the technical progress of the research, development and production phases of the atomic bomb project at Los Alamos. He testified that all activity and work at the project were highly classified and top secret; that he was informed of many of the experiments incidental to the development of the atomic bomb; that he knew what went into parts of it and understood the entire subject matter; that in 1945, on many occasions, he saw the actual bomb that was being developed. Derry testified that Exhibit 8 and the Greenglass descriptive material related to the atomic bomb which was in the course of development in 1945; that they demonstrated with substantial accuracy the principle involved in its operation; that a scientist could perceive therefrom to a substantial degree what its actual construction was; that the information contained therein was top secret and related to the national defense of the United States; and that the information and sketch concerned a type of bomb similar to that dropped at Nagasaki.

### The First Section 2255 Motion

The petitioner's first section 2255 attack was directed, among other matters, to Exhibits 2, 6, 7 and 8 and the testimony of Greenglass, Dr. Koski and Derry with respect thereto.[9] Three separate claims were made:

(1) Concealment of Coached Evidence[10]

Petitioner alleged that Greenglass had perjured himself to the knowledge of the prosecution when he swore he had prepared these exhibits from memory and had not been aided in their preparation by a scientifically trained person. No factual evidence was offered to support this charge. What was relied upon was the opinion of scientists, set forth in affidavits, that it was "improbable," "impossible" or "inconceivable" that Greenglass with his limited technical education could have prepared the sketches represented by Exhibit 8,[11] as well as 2, 6 and 7,[12] and the descriptive material showing the workings, mechanism and component parts of the Nagasaki type

---

8. The press was not enjoined to secrecy, but requested by the court to exercise "good taste." However, various publications, including "Life" and "Time," published in 1951 the substance of his testimony.

9. These charges contained in the Rosenbergs' 1952 petition were adopted by petitioner. Sobell's 1952 petition, ¶ 25; and November 25, 1952 Amendment to Petition. Also his Petition for Certiorari, p. 34, Sobell v. United States, 345 U.S. 1003, 73 S.Ct. 1131 (1952).

10. Rosenberg petition (1952), pp. 64–68.

11. Affidavit of Thomas R. Kaiser, questions 7 and 8, attached to Rosenberg petition, (1952).

12. Affidavits of James G. Crowther, Thomas R. Kaiser, Jacques S. Hadamard and John D. Bernal, attached to Rosenberg petition, (1952).

bomb without outside coaching or the use of reference books.

### (2) Claim of Lack of Secrecy[13]

Another claim then advanced was that the atomic information transmitted to the Soviet Union was not secret.[14] Koski's testimony that the information contained in Exhibits 2, 6 and 7 was secret was challenged by a scientist who contended that this information was widely known and published throughout the entire world.[15] The petitioner branded Dr. Koski's testimony as false and argued that the classification by the government of the material was capricious and arbitrary. Although petitioner's scientist did not refer expressly to Exhibit 8 as he did to 2, 6 and 7, it is abundantly clear from his opinion,[16] the petition,[17] and his counsel's oral argument[18] that the attack on the secrecy extended to *all* the atomic information. With respect to this claim of nonsecrecy, petitioner alleged that "the detail of the atom bomb is trivial technically and most inconsequential as a secret,"[19] and in conclusion urged:

"5) The 'secret' which David Greenglass allegedly transmitted to the U.S.S.R. was no secret at all to any explosive expert.

"6) The ability of any country to produce an atomic bomb rests upon its ability to mobilize the hundreds of thousands of scientists, technicians and laborers and its ability to make available the vast industrial plant required. It does not rest on stealing the 'secrets' of the United States." [20]

### (3) Claim of Lack of Value to the Soviet Union[21]

Finally, petitioner claimed that the atomic information was of little or no value to the Soviet Union. Here he alleged that the Soviet Union

"did in fact have the necessary scientists and technology for doing the job. * * * It did not need any American secrets to produce a bomb." [22] In support of this contention he relied upon the opinion of one of the scientists that "any advantage to any foreign nation by the divulging of the design of any particular lens would be nonexistent or very small. * * * " [23]

The petitioner's charges and those of his codefendants were rejected by Judge Ryan without a hearing in a carefully

---

13. Rosenberg petition, (1952), p. 71, et seq.

14. The opening paragraphs of petitioner's argument made clear that both Koski's and Derry's testimony was subject to attack. Rosenberg petition, (1952), p. 71.

15. Affidavit of John D. Bernal, attached to Rosenberg petition, (1952). Challenged was Koski's testimony to the effect that Exhibits 2, 6 and 7 concerned "a new and original field," and could have been of advantage to a foreign nation. Record, p. 478.

16. Affidavit of John D. Bernal, ¶ 5(b), attached to Rosenberg petition, (1952).

17. Thus the petition attacked Derry's testimony as well as Koski's. Rosenberg petition, (1952), p. 71, and argued that the "method for the assembly of the fissile materials was just another detail." Id. at 80.

18. The broadside nature of the attack appears from the oral argument of the motion. Petitioner asserted that "the alleged subjects of transfer from Greenglass to the petitioner Julius Rosenberg and the petitioner Ethel Rosenberg were, in fact, public property, and not secret." Transcript of Argument, November 28, December 1, 2, 1952, p. 41. He also asserted: "The third point shows that there were no secrets concerning (1) the alleged subjects of transfer here, and (2) with respect to any and all processes that went into the construction of the complete atom bomb that was first dropped at Hiroshima and later the improved bomb at Nagasaki * * *." Id. at 108.

19. Rosenberg petition, (1952), p. 81.

20. Rosenberg petition, (1952), p. 98.

21. Id. at 74, et seq.

22. Id. at 82.

23. Affidavit of John D. Bernal, attached to Rosenberg petition, (1952).

considered opinion,[24] and his ruling affirmed upon appeal.[25]

### The Present Petition

In May 1966 Exhibit 8 and the Greenglass-Derry testimony with respect thereto were ordered unimpounded on petitioner's motion and thereafter he filed the present amended petition enlarging previous charges of prosecution misconduct.[26]

*First:* Petitioner, now offering the affidavits of a different group of scientists from those relied upon in the 1952 proceeding, again attacks the evidence of the atomic information transmitted through Greenglass to the Soviet Union. The charges center principally about Exhibit 8, Greenglass' testimony and Derry's testimony; also involved are Exhibits 2, 6 and 7. Whereas in the original section 2255 proceeding it was charged that Greenglass committed perjury to the knowledge of the government because, according to the first group of scientists, it was "improbable" or "inconceivable" that he could have drawn the exhibits, now he is faulted because Exhibit 8 and his exposition of the descriptive material fail to measure up to a scientific standard of perfection as to accuracy, precision and detail.

Whereas in the original proceeding Dr. Koski's testimony was denounced as false,[27] and later as the "now apparent hoax,"[28] now Dr. Koski is accepted. Here the charge is that the government's failure to have him, a recognized scientist, instead of Derry, an electrical engineer, testify with respect to Exhibit 8 and the related testimony demonstrates that it knowingly introduced false evidence since the prosecution was aware that Kos-

ki or other scientists would not testify that the exhibit depicted with substantial accuracy the principle involved in the bomb developed at Los Alamos.

The scientists, with respect to the unimpounded evidence, according to one of them, pursued two inquiries:

(1) its accuracy and completeness as a description of the plutonium bomb developed at Los Alamos; and

(2) its possible value in assisting in the development and construction of a bomb by the Soviet Union.

With respect to the first inquiry, the scientists find errors and omissions in Exhibit 8 and in Greenglass' testimony as to what was contained in the twelve-page description. With respect to the second inquiry, the experts aver that the construction of an atomic bomb involved no single "secret" in the scientific sense, but did involve "a highly complex set of technical tricks, devices and processes, combined * * * with an immense and versatile industrial capability"; that before bomb construction can even begin, a nation must build a full-fledged atomic energy industry, and obtain an adequate supply of fissionable material, all of which require research, development and construction activities measured in hundreds of millions of dollars; that Greenglass' testimony of the sketches was deficient because it omitted the requisite scientific and technical information needed for plutonium production; that the information "was too incomplete, ambiguous and even incorrect to be of any service or value to the Russians in shortening the time required to develop their nuclear bombs.":

Apart from the fact that the issue of the secrecy and value of the information

**24.** United States v. Rosenberg, 108 F. Supp. 798 (S.D.N.Y.1952).

**25.** United States v. Rosenberg, 200 F.2d 666 (2d Cir. 1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, rehearing denied, Sobell v. United States, 345 U.S. 1003, 73 S.Ct. 1131 (1953).

**26.** Petitioner in May 1966 filed a petition containing only the charges considered under Part II of this opinion.

**27.** His testimony "that the theory of 'implosion' utilized for the purpose of assembling the critical mass of fissionable metal was invented and developed at the Los Alamos Project." Rosenberg petition, (1952), p. 74.

**28.** Sobell brief, (1952), p. 35, United States v. Rosenberg, 200 F.2d 666 (2d Cir. 1952).

to the Soviet Union was determined upon the merits in the first section 2255 motion, their criticism of Greenglass' testimony and his sketches is irrelevant in the light of the substance of his testimony. Their view might be relevant had Greenglass testified that he had purloined at Los Alamos and turned over to the Rosenbergs a set of blueprints, working drawings, dimensional plans and written specifications for the production of plutonium and the bomb, and that Exhibit 8 and the twelve-page description purported to convey this information. But this was neither Greenglass' testimony nor his role in the conspiracy. His role was to get classified information—to get what he could.

Greenglass, it will be recalled, was given a description in January 1945 by Rosenberg of an atomic bomb to alert him to the type of classified information that was desired. He testified that this was the first time he ever heard a description of any type of atom bomb, but after months of snooping, conversations, observations and his own machining work, in September 1945, as he informed his co-conspirators, he thought he had "a pretty good description of the atom bomb," and then drew the sketch and prepared the related material. Greenglass never claimed that he had obtained definitive documents, and on cross-examination readily acknowledged he had never taken such material and also that he was no scientific expert, although he knew something about the "basic theory of atomic energy."[29] Exhibit 8, as was expressly called to defense counsel's attention, contained the legend "not to scale."[30] It was represented as a schematic sketch,[31] not a blueprint, and there is no warrant for the contention that the jury or defense counsel were misled as to what it represented.[32]

That the scientists do not grade Greenglass' drawing and his descriptive testimony one hundred per cent, judged by their scientific and engineering standards of the information required to enable the Soviet Union in 1945 to construct an atomic bomb is not the test of Greenglass' credibility as to what classified information he did deliver to the Rosenbergs in September 1945. Were there a complete concensus of all the learned atomic scientists in the world that his description was deficient, it would not draw in issue the truthfulness of his version of what he then transmitted to Rosenberg.

*Second:* It is next urged that Derry's opinion as an expert as to what the exhibit and the Greenglass description portrayed was false. Other than the contrary opinions of the scientists, nothing is presented to impugn Derry's testimony. The fact that they disagree with Derry's opinion does not establish its falsity. Significantly, one of the scientists concedes that judgment on the matter "must be a highly subjective one indeed." Derry's credibility was for the jury and not a panel of experts, who sixteen years after the event seek to undermine it. This aspect of petitioner's motion renews the earlier attempt, also on the basis of affidavits of scientists who neither saw nor heard the witnesses, to condemn them as untrustworthy. Petitioner may no more do so now than

29. Record, p. 612.

30. Record, p. 499.

31. As Greenglass testified with respect to the sketches, "None of those are to scale. So they are all schematic." Record, p. 462.

32. Upon the cross-examination of Greenglass, the following exchange occurred:
"THE COURT: * * * The charge here is not that he gave him everything that might have been accurate in every minute detail, but that he transferred secret material pertaining to National Defense.
"MR. E. H. BLOCH: That is correct.
"THE COURT: And whether he might have turned something over, miscalculating a figure or making an error here and there, is not material to the charge. * * *" Record, p. 613.

the Court of Appeals permitted it to be done in 1952.[33]

■ *Third:* Next it is contended that even if Derry did not knowingly testify falsely, the government knew that Derry was not an expert, but nevertheless had him testify that Exhibit 8 and the description represented with substantial accuracy a cross-section and the principle of the atomic bomb dropped at Nagasaki; that it knew his testimony was false and inaccurate; that it failed to call Dr. Koski or other government scientists since it knew they would not so testify. The accusation dissolves when considered against the indictment charge, the substance of the Greenglass-Derry testimony and the hypothesis upon which the scientists predicated their opinions.

The conspiracy charge was not limited to atomic bomb information. The crime charged was a conspiracy to communicate to the Soviet Union documents, writings, sketches, notes and information to be used to the advantage of the Soviet Union. This was made clear to the jury both during the trial[34] and in the court's charge.[35] The evidence established the transmittal by the conspirators of other classified material relating to the Los Alamos project, as well as secret information of other defense activities.

There is no evidential support for the charge that Derry was not an expert or that the government knew he was not an expert. His experience and the nature of his work in relation to atomic bomb activity and construction were fully stated. The petitioner did not concede his qualifications as an expert; this was challenged and put in issue at the trial.[36] The petitioner was free to call witnesses to contradict Derry, but failed to do so and no action of the government prevented him from doing so. Petitioner's related claim that had Dr. Koski testified with reference to Exhibit 8 his answers would have differed substantially from Derry's is unsupported.

The charge that the government knowingly fostered false testimony through Derry is based upon the scientists' opinions that Exhibit 8 and the Greenglass description, measured by their standard of scientific perfection, were "both qualitatively and quantitatively incorrect and misleading." Their opinion is based upon a self-propounded inquiry with respect to the now unimpounded material's "accuracy and completeness as a description of the plutonium bomb developed at Los Alamos in 1945." The scope of this inquiry is not the same as that directed to Derry at the trial. The questions put to him were:

"Q Does the knowledge as disclosed in the material * * * read in conjunction * * * with Exhibit 8 demonstrate substantially and with substantial accuracy the principle involved in the operation of the 1945 atomic bomb?

"A It does.

"Q Can a scientist and can you perceive what the actual construction of the bomb was?

"A You can." [37]

■ The record does not support the charge that the government used Derry

---

33. United States v. Rosenberg, 200 F.2d 666, 670–671 (2d Cir. 1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, rehearing denied, Sobell v. United States, 345 U.S. 1003, 73 S.Ct. 1131 (1953).

34. During Greenglass' testimony the court admonished defense counsel in the presence of the jury: "You must remember that the conspiracy charge is a general statement to turn over information to the U.S.S.R. pertaining to national defense. It is not limited to atomic information." Record, p. 511.

35. In its charge to the jury the court stated: "Bear in mind * * * that the Government contends that the conspiracy was one to obtain not only atomic bomb information, but other secret and classified information * * *." Record, p. 1557; also p. 1560.

36. Upon the ground that · " * * * this witness has failed to qualify as an expert on the ingredients and their functions contained in the statement just read to him." Record, p. 910.

37. Record, pp. 910–11.

through these answers to obtain deceptive testimony.

■ Although the exhibit shown to Derry specified "not to scale," the scientists now, as did one in the 1952 proceeding,[38] condemn it and Derry's testimony because it was not so drawn. No statement, direct or indirect, was made either by Derry or the government that the exhibit and the Greenglass testimony purported to represent more than Derry's testimony indicates. Defense counsel acknowledged that the sketch and description were not "a complete description of the cross-section of the atomic bomb * * * and how it works and the principles under * * * which it works." [39] and himself developed that a twelve-page description of the atom bomb "would not, of course, be a complete description * * *." [40]

To fault the government because the sketch is inaccurate and incomplete, judged by scientific standards of "accuracy and completeness," is to fault it on the basis of questions which were impermissible in the light of the Greenglass evidence. A hypothetical question to any expert, whether called by the prosecution or the defense, could only have been posited on matters in evidence—in this instance, the sketch and the Greenglass description of the twelve-page memorandum. But over and beyond this, an analysis of the scientists' affidavits, notwithstanding their depreciation of the Derry-Greenglass testimony, demonstrates the essence of Derry's foregoing testimony is not contradicted. Thus one of them states: "Re the nature of the information in Exhibit 8: *the sketch presented is the kind I would use to explain the ideas involved in the bomb,*" [emphasis supplied] although understandably, in the light of the scope of the scientists' inquiry, he adds: "It can in no way be taken as an engineering drawing which could be used to construct the bomb." The same scientist, although of the view that eventually the Russian scientists would probably have arrived at the design of an implosion bomb during the time required for plutonium production, and hence he " * * * would not expect the information in Exhibit 8 was able to save them any significant time in the development of an atom bomb," does add: "*Instead, such information could save some effort.*" [Emphasis supplied.] How much effort could have been saved or advantage gained he does not opine.

Another scientist states that the Greenglass description "is correct in its most vague and general respects that explosive lenses were used to achieve implosion of a core containing plutonium and beryllium components, the overall system being arranged in an essentially spherically symmetrical configuration."

---

38. Affidavit of John D. Bernal, ¶ 5(b), attached to Rosenberg petition, (1952).

39. "MR. E. H. BLOCH: Would you say * * * that [Exhibit 8 and the Greenglass testimony] would represent a complete description of the cross-section of the atomic bomb and the function of the atomic bomb and how it works and the principles under * * * which it works?

"THE COURT: I don't think it was offered on the theory that it represented a complete—is that true, or am I mistaken?

"MR. SAYPOL: Indeed not. As I said when I had the witness Koski on the stand, the import of this whole thing is that there was enough supplied to act upon—

* * * * *

" * * * You remember, your Honor, I used the colloquialism, tip off. That is exactly—

"THE COURT: I don't think it was offered as a complete or as a detailed description." Record, p. 915.

The prosecutor's references relate to the questioning of Koski with respect to Exhibits 2, 6 and 7: "And would I be exaggerating if I were to say, colloquially, that one expert, interested in finding out what was going on at Los Alamos, could get enough from those * * * exhibits in evidence which you have before you to constitute a tip-off as to what was going on at Los Alamos?" Record, p. 483.

40. Record, pp. 914–15.

He queries himself and answers with respect to Derry's testimony:

> "Does this constitute a 'substantially accurate representation of the principle' of the bomb? In my opinion, no. Nevertheless, it is clear that such a judgment must be a highly subjective one indeed. A diagram that may obviously represent a 'principle' to a research expert who has devoted years of hard work and worry to the problem, and who cannot help but correct and fill in the gaps subconsciously with his own knowledge, may be totally useless to a technician who has actually to construct the device. We undoubtedly have such a situation in Exhibit 8."

Thus he acknowledges that it would not have been difficult for a scientist to fill in the gaps—hardly different from Derry's testimony quoted above. And why it is assumed that classified information transmitted to a foreign power would not be evaluated by a research expert is not discussed.

Still a third scientist states: "While the sketch contained in government Exhibit 8 illustrates the general points: the use of explosive lenses to make spherical implosion; the use of electrical detonation for simultaneity; the use of a plutonium sphere, and the use of beryllium as one component, it is barren of any meaningful or correct *quantitative* information," and the description is in some respects erroneous. He continues: "It is a somewhat schematized cross-section, which might be called a pedagogical descriptive picture." Again it is observed that the criticism is based upon a standard of scientific perfection and detail and not upon the evidence given at the trial.

The government was not required to produce evidence to establish that the espionage agents had not achieved perfection because of their failure to obtain and transmit to the Soviet Union all

scientific and engineering sketches and specifications required for large scale production and construction of the atomic bomb. The record makes clear that the hypothesis upon which the scientists base their criticism is not the hypothesis upon which the trial was conducted. Perhaps the short answer to their observations is the comment of Mr. Justice Douglas: "The Rosenbergs obviously were not engaged in an exchange of scientific information in the interests of science." [41]

■ *Fourth:* Petitioner next contends that by the use of Derry's testimony, by leading questions put to witnesses, by making known the presence at the trial of representatives of the Atomic Energy Commission and other government representatives, by references to renowned scientists, and by other means the government sedulously and falsely established in the minds of the jury, court and defense that the Soviet Union had obtained the "secret" of the bomb long before it had been predicted the Soviet Union could have produced one; that by reason of the aforesaid government conduct, defense counsel were deceived into accepting the testimony as to the accuracy of the sketch as fact, in consequence of which they were trapped into moving to impound the evidence and into not offering scientific evidence to contradict the Greenglass-Derry testimony, with the result that the jury was led to accept Greenglass' entire testimony; that as a further result the defense counsel in various respects failed adequately and effectively to defend petitioner.

A review of the entire record reveals that this contention rests upon a distortion of the record, a disregard of the substance of the testimony, reference to matters out of context, and others not presented to or not occurring in the presence of the jury and impermissible inferences.[42]

41. Rosenberg v. United States, 346 U.S. 273, 318, 73 S.Ct. 1152, 1173, 1175, 97 L.Ed. 1607 (1953).

42. A prime example of petitioner's manner of reading the record is his claim that the government, in using the word

The motion by the Rosenbergs' counsel to impound Exhibit 8 was spontaneous and indeed caught the prosecution by surprise. The assertion that defense counsel were intimidated in their action by references to and the presence of representatives of the Atomic Energy Commission is repelled by the fact that it was this petitioner's counsel who in no uncertain terms,[43] and as indeed was his right, refused to concede that the material was secret, classified and pertained to the national defense, in consequence of which witnesses were called to testify on this subject. Clearly the presence of these officials did not deter his counsel from contesting the issues.[44]

█ Petitioner professes to see a conspiracy to suppress evidence and to mislead his counsel in the failure of the prosecution to call Dr. J. Robert Oppenheimer, Dr. Harold C. Urey and Dr. George B. Kistiakowski to testify, although they were included in the list of potential witnesses served pursuant to 18 U.S.C. section 3432. The names of all those so listed were read to the jury on the voir dire to learn if any was known to the veniremen. Petitioner now asserts that because of this and other references to the three atomic scientists the government represented that they would testify, in consequence of which defense counsel were fraudulently induced to believe, and the jury was impressed, that the scientists would testify that government Exhibit 8 and the related testimony represented a true and accurate cross-section and description of the bomb, and so counsel accepted the accuracy of the Greenglass-Derry testimony and were trapped into moving to impound and also into foregoing any challenge to its accuracy. This is an-

"secret" in connection with the atomic information, was representing that the sketches convey "the secret" of the bomb. A reading of the passages found objectionable by petitioner reveals that the government's reference, in words or substance, to "secret" was to the classified or confidential nature of the information. Thus, for example, the court suggested that the problem of public disclosure with respect to Greenglass' description of Exhibit 8 could be avoided by a stipulation that the matters contained therein *"were of a secret and confidential nature."* [Emphasis supplied.] Record, p. 501.

Again, throughout the petition, petitioner attacks the government's use of such terms as "sketch of the very bomb itself" and "cross section of the atom bomb itself" to describe the Exhibit 8 material. Petitioner's scientists do not contend that the sketch or description were of something other than the bomb. If a sketch of an object is inaccurate, it would still be a sketch of that object; it would simply be an inaccurate sketch. In using phrases such as these, the government was describing Exhibit 8 in ordinary language. Thus, in criticizing the accuracy of the exhibit, one of petitioner's scientists himself states: "The cross section and its description are not factually correct. * * *" See also nn. 43 and 44, infra.

43. When asked to stipulate that the matter was secret and pertained to the national defense, petitioner's counsel stated: " * * * [W]e would not be defending the rights of our client properly by stipulating any such thing. We feel that our national defense is secure only in so far as * * * we secure the liberty of our present client, and tomorrow the next client, and so on, and because of that we feel that a confession [sic] of that kind would not be in the best interests of the defense of our client, not because of the nature of the testimony or anything like that." Record, p. 509.

44. Petitioner's suggestion that the government supplied the initiative for the Rosenbergs' counsel's offer to stipulate that the sketch and the description were secret and concerned the national defense is not supported by the record. After the motion to impound Exhibit 8, the government asked Greenglass to tell exactly what the descriptive material contained, and he was prevented from doing so by defense counsel's application that this matter, too, be kept secret. The prosecutor's statement with reference to his consultations with the AEC came after and in reply to this application by defense counsel. Also, the prosecutor's statement, as well as the comment that Derry's testimony was a "security matter" and would "establish the authenticity of the information that Greenglass gave to Rosenberg," was made out of the hearing of the jury. Record, pp. 499–501 and 902.

other oft-reiterated allegation which is without support in the record or otherwise. No statement was made as to the nature of the testimony to be given by any of the listed witnesses. No representation, direct or indirect, was made as to what the three scientists would testify if called to the stand. When their names were mentioned to the jury, the trial had not begun and defense counsel were without knowledge of the contents of any of the exhibits in question or the nature of the Greenglass-Derry testimony with respect thereto. Moreover, as already noted, the fact is that after Exhibit 8 was in evidence, petitioner's counsel challenged its secrecy and pertinence to the national defense and did not at any time stipulate its accuracy or authenticity. Further, during the trial and even before Derry was called, the defense was advised by the prosecution that it did not intend to call all witnesses listed,[45] since it believed additional testimony would be cumulative.[46] The defense could have compelled the appearance of these witnesses by direction of the court or by means of its processes; or, if it preferred not to have them testify, since they were in government service, it could have asked for an appropriate instruction to the jury on permissible inferences from the nonappearance of witnesses under the control of a party.[47] Furthermore, this is not the first time that a claim has been made with respect to the failure to call Drs. Oppenheimer, Urey and Kistiakowski. As far back as 1952, upon the direct appeal, it was urged. "The prosecution failed to produce for examination the above named scientists, whose testimony could have clarified doubts about the accuracy of David [Greenglass], * * * with respect to his scientific exposition." [48]

Petitioner's attempt to bolster his argument with respect to the government's scientists by labelling "a deceptive ploy" the prosecution's questioning of Greenglass concerning scientists he knew were at Los Alamos is unavailing. The identity of these scientists was classified and Greenglass testified he transmitted their names to Rosenberg; the interrogation obviously was calculated to develop evidence in support of the charge.

 There is no basis for the claim that the court was misled as to the importance of the atomic information insofar as this petitioner is concerned. The record makes clear that the court's evaluation of the importance of the atomic information played no part in its sentence of Sobell. Before imposing sentence upon him, the court stated: " * * * [T]he evidence in the case did not point to any activity on your part in connection with the atom bomb project." [49]

 *Fifth:* Finally, the contention that the present claim is based upon newly discovered facts and therefore could not have been presented on prior applications and appeals because the material was impounded for sixteen years flies in the face of the record. Petitioner's statement that "The fact that it [the impounded material] would be available in

---

45. Record, p. 870. At another point, when a reference was made to a doctor on the list who was not called, the following occurred:

"THE COURT: You mean to say that the Government has to call every witness listed on that?

"MR. A. BLOCH: I didn't say anything of the kind. I am just identifying the man." Record, p. 1325.

46. Although the list contained the names of 100 potential witnesses, only 22 testified.

47. Indeed, defense counsel in his summation taxed the government for failure to call certain witnesses. Record, p. 1499.

48. Rosenberg brief, (1951), p. 7, United States v. Rosenberg, 195 F.2d 583 (2d Cir. 1952).

49. Record, p. 1620. Even as to the Rosenbergs' sentence, the importance of the atomic information to the Soviet Union was strongly challenged by the Rosenbergs' counsel in his argument upon sentencing, Record, p. 1606, and the court's evaluation of the importance of the material was attacked upon the direct appeal as "egregious" and with "little substance." Rosenberg brief, (1951), p. 139, United States v. Rosenberg, 195 F.2d 583 (2d Cir. 1952).

a subsequent proceeding was itself impounded and not known to petitioner or his present counsel until the successful application made in petitioner's behalf in late April 1966" is simply contrary to the record. Petitioner heard his counsel acquiesce in the motion to impound. He saw the exhibit. He heard the detailed descriptive testimony relating to it. He knew its importance. He heard the court's statement that it would be available to the defense at all times.[50] Nor was the impounded material a forgotten incident. Repeated references were made to it during the trial and in various post-conviction proceedings. Its significance was not lost upon petitioner since that exhibit, together with Exhibits 2, 6 and 7 were the subject of his 1952 section 2255 proceeding. Petitioner has been described by one of his lawyers as "a scientist and holder of a Master's degree. * * * clearthinking and articulate."[51] He assisted in the preparation of his first petition,[52] as he did in this one. Moreover, the printed record on direct appeal contains a reference to the availability of the impounded testimony.[53] Thus, in addition to petitioner and his trial counsel, who continued to represent him in association with other counsel in several post-conviction proceedings, three of petitioner's present staff of six lawyers, who have represented him as far back as 1956,[54] knew from the printed record that the impounded material was available.

## II. THE CLAIMS WITH RESPECT TO EXHIBIT 16 AND TO THE GOLD-GREENGLASS MEETINGS ON JUNE 3, 1945

 Harry Gold testified he had been a member of the Soviet espionage system from 1935 to shortly before his arrest by the Federal Bureau of Investigation in May 1950; that from March 1944 to late December 1946 his superior was Anatoli A. Yakovlev, whom he knew only as John. In May 1945 Yakovlev directed him to meet Klaus Fuchs on the first Saturday in June 1945 (June 2nd) at Santa Fe, New Mexico, and then to proceed to Albuquerque, New Mexico on an important mission. Yakovlev gave him the name of Greenglass with an address on High Street, Albuquerque; also the recognition signal "I come from Julius," a piece of a cardboard box cut irregularly, and $500 cash for Greenglass. The identification pattern, the Greenglasses had previously testified, had been arranged between them and the Rosenbergs in January 1945 in New York City, when Greenglass was on furlough. Gold testified that, as directed, he met Fuchs on June 2, 1945 at Santa Fe and received from him classified information; that he went on to Albuquerque and sought Greenglass at the High Street address, but was told by an old man that the Greenglasses were out for the evening and would be in early the next morning; that he "finally managed" to obtain lodging in the hallway of a rooming house, and on Sunday morning registered at the Hotel Hilton under his own name; that he went to the High Street address that morning, met the Greenglasses, to whom he introduced himself as "Dave from Pittsburgh," exchanged identification signals, and gave them the envelope containing the $500 cash he had received from Yakovlev. Greenglass told Gold to return that afternoon, as the information was not ready. Upon his return he received from Greenglass an envelope which contained information on

---

50. "The stenographer will read it back to you any time you want it," and " * * * I may say to the defense, for any subsequent proceeding it will be made available." Impounded testimony, p. 4.

51. Affidavit of Howard N. Meyer in support of Sobell petition, (1952), p. 28.

52. Ibid.

53. Before the impounded testimony was read to Derry, the court stated: "[T]here is to be no transcription made, and your stenographic minutes are to be considered impounded. Of course, if any counsel wants to have it read back for purposes of examination, it may be made available for that purpose." Record, p. 903.

54. See United States v. Sobell, 142 F.Supp. 515, 517 (S.D.N.Y.1956).

the atom bomb (Exhibits 6 and.7). Gold then returned to New York, arriving on June 5, 1945, and delivered to Yakovlev the material received from Greenglass and Fuchs.

The Greenglasses had previously testified to like effect with respect to the June 3 meetings with Gold. Mrs. Greenglass also testified that the next day, June 4, she deposited $400 in an Albuquerque bank.

Neither counsel for the Rosenbergs nor for petitioner cross-examined Gold. Two additional witnesses testified. Thereupon, at a bench conference, the prosecutor stated he had a photostat of the registration card of Harry Gold at the Hotel Hilton on June 3; that "the original [was] on the way, together with a witness if required"; [55] and also he had testimony as to the bank records; that he wanted to offer a photostat of the registration card as a record regularly kept in the course of business. Defense counsel stated they had no objection. The matter was repeated before the jury, the prosecutor stating, " * * * [T]he government has available a number of witnesses from distant places to establish the authenticity of the records, hotel registration records, bank records." [56] Exhibit 16 was received in evidence under a stipulation that "it was made in the regular course of business by the party whose records it comes from." [57] Thereupon both the face and reverse sides were read and exhibited to the jury. At the next trial session a photostat of a ledger sheet of the Albuquerque National Bank, together with a bank credit slip showing a deposit of $400 to the account of Ruth Greenglass, were received in evidence as Exhibit 17.

Up to the filing of the present petition, Gold's testimony of the June 3 events not only has not been challenged, but was accepted. Rosenbergs' counsel, in his summation to the jury stated: "I didn't ask him one question because there is no doubt in my mind that he impressed you as well as impressed everybody that he was telling the absolute truth, the absolute truth." [58]

Now more than fifteen years after the trial, petitioner charges that there were no June 3 meetings between Gold and the Greenglasses at Albuquerque; that their testimony was perjurious; that upon information and belief the government knew their testimony was perjurious; that Gold was not registered at the Hotel Hilton on June 3, 1945; that Exhibit 16 showing Gold's registration at the hotel on June 3 is a forged, fraudulent and after-contrived document; that upon information and belief such false and perjured testimony and the forged and fraudulent exhibit "had been created and contrived by Gold and the government at the inducement and suggestion of the latter." There is not a word of direct evidence to support these serious charges made upon information and belief. Petitioner urges, however, that corrupt prosecution conduct may be inferred from Exhibit 16 itself; from the circumstances of its introduction into evidence; from the fact that allegedly the government, after trial, caused the destruction of the original (not in evidence) of Exhibit 16; and from pretrial statements of Gold which allegedly establish the falsity of his testimony and would have impeached his credibility, which were knowingly suppressed by the government.

The court has examined all the material relied upon by petitioner and finds that his charges are not sustained, that the contended-for inferences are not warranted; further, that matter now claimed as newly or recently discovered has been known or available to him for many years, some of it as far back as the trial itself.

### Exhibit 16

*First:* The claim that Exhibit 16 is forged rests in large measure upon

---

55. Record, p. 867.

56. Id. at 868.

57. Id. at 869.

58. Record, p. 1479.

the opinion of a handwriting expert with respect to certain figures and initials thereon compared with those on another Albuquerque Hilton Hotel registration card dated September 19, 1945. Each contains on its face a signature, Harry Gold, an address and the name of an employer. These appear to be in the same handwriting on each card and evidently no question is raised as to this portion.[59] Below, the following appears on Exhibit 16:

| Arrived | Room | Rate | Clerk | Baggage |
|---|---|---|---|---|
| 6–3–45 | 1001 | 1.50 | ak. | |
| | | day rate until 8 p. m. | | |

The September 19 card contains the following under the corresponding legends:

| 9–19–45 | 521 | 5.00 | ak. |
|---|---|---|---|

———◆———

Petitioner asserts that the initials "ak." reflect those of Anna Kinderknecht (now Mrs. Larry A. Hockinson), allegedly the room clerk at the Hilton Hotel in June and September 1945. The handwriting expert, based upon standard writings of Mrs. Hockinson, is of the opinion that she wrote the line of figures and initials appearing on the September 19 card, but that she did not write any of the figures or initials on the June 3 card, Exhibit 16.

The fact is that it hardly needed an expert to make this observation. Accepting the expert's opinion, it does not warrant the inference that the June 3 card was not a record kept in the regular course of the Hotel Hilton's business; neither does it warrant the further inference that the card was fabricated and contrived by the government and Gold.

The card on its face has all the indicia of a registration card kept in the ordinary course of business by the Hotel Hilton; it is an Albuquerque Hilton card, bearing the appropriately printed title and number; the required description has been written upon it, and it bears the receipt and time stamp of that hotel. Taking as correct the expert's conclusion that the two cards are in different handwriting, it is by no means a reasonable inference that the June 3 card was not kept in the regular course of the business of the Hotel Hilton.[60] The circumstance that at a public and busy hotel [61] the same initials appear on the two cards and they and the data as to rate, stay, departure and room number are in different handwriting does not, in one fell swoop, permit the inference that it was "forged"; that the government knew it was forged or contrived its forgery; that Gold did not register at the Hotel Hilton on June 3; that he committed perjury as to meetings that day with the Greenglasses; that David Greenglass and his wife committed perjury in so testifying; that the prosecutor perpetrated a fraud when he stated a witness was on his way with the original to testify that it was kept in the regular and usual course of business; that a grand fraud had been perpetrated

59. Counsel upon the argument conceded that the Gold signatures on both cards were the same. SM 69.

60. An affidavit submitted in support of petitioner's application states that the hotel was visited during the course of an investigation "and a number of people who had been employed there in 1945 and/or 1950 were interviewed."

61. Gold described Albuquerque on June 2–3, 1945 to his lawyer: " * * * The town was literally, as they say, jumping. There was absolutely no room to be had anywhere." Transcript of Tape Recordings, June 14, 1950, Reel 4, p. 53.

by the Federal Bureau of Investigation, the United States Attorney and government witnesses to establish falsely that meetings occurred on June 3 between Gold and the Greenglasses at Albuquerque so as to give credence to Gold's testimony that the day before he had met and received from Klaus Fuchs classified material in order thereby to tax petitioner and his codefendants with the well-publicized activities of Fuchs in the Soviet spy system.

The entire theory of a grand conspiracy is the product of a fertile imagination. The unrestrained hurling of invective, page after page, in the petition does not obscure the lack of evidence. A constant drumfire of vituperation does not establish basic facts which are required before inferences may reasonably be drawn to support charges of fraud and perjury.

Additionally and significantly, the petition is silent as to the absence of any affidavit from Mrs. Hockinson. She is one person still available who can testify with respect to the June 3 card, whether it was kept in the regular course of the hotel's business, whether it is authentic, and the practice with respect to the preparation of registration cards by the hotel clerks. The absence of an affidavit or an explanation for its omission takes on added significance since not only has her whereabouts been known from 1961 to experienced investigators who have interested themselves on behalf of petitioner, but she has cooperated with them; she has submitted samples of her handwriting to and been in touch with them. Her availability has also been known to petitioner's counsel.

Nor do additional matters to which petitioner adverts warrant the inference that government agents participated and fostered perjury on the part of Gold and Greenglass and manufactured the June 3 registration card. The original of Exhibit 16 was returned by the FBI shortly after the trial to the Hotel Hilton, which allegedly destroyed it in 1957 in accordance with its policy as permitted by the laws of New Mexico. The government is accused of perfidious conduct in not retaining it and is charged with deliberately sending it onto the hotel, knowing that it would be destroyed, with intent thereby to prevent handwriting examination. This contention, so typical of others recklessly made without factual support, falls of its own weight. The original registration card is not the exhibit in evidence. The photostat is Exhibit 16. This has been and still is available for, and indeed has been inspected by, petitioner and his handwriting expert who has rendered an unequivocal opinion based thereon. Just why it should have been assumed that in 1967, ten years after it had been destroyed in normal routine practice, petitioner would charge the government with fraud based upon the return of the original to the hotel in 1951 is not apparent.

Equally without substance is the contention that the omission from Exhibit 16 of an FBI agent's initials, which appear on most of the other government exhibits, supports the claim that the document is a forgery. Exhibit 17, the bank record of the $400 deposit by Ruth Greenglass on June 4 is also without an agent's initials. Its authenticity has not been challenged.

Great stress is laid upon the fact that Exhibit 16 on its reverse side contains a time stamp, "June 4, 1945," as contrasted with the June 3 date on the face thereof, whereas the September 19 card contains the corresponding date on the reverse side. Both sides of Exhibit 16 were read to the jury. The difference in dates was evident. Just why an inference of corrupt conduct should now flow from this circumstance is not clear —any more than from the fact, noted by the handwriting expert, that erasures and smudges appear on both cards.

Petitioner suggests that counsel did not cross-examine Gold in reliance upon the prosecution's statement that the hotel registration card was authentic and that the original was on its way. Apart from the distortion of the prosecution's statement in requesting a stipulation as to the photostat, there is no showing that a

witness was not on the way with the original to testify that it was a registration card kept in the regular course of business. But more important, petitioner's suggestions that his counsel did not cross-examine Gold because he was misled is demonstrably false. Gold was still under direct examination on March 15 when the court adjourned for the day. The following morning, when he resumed the witness chair, the prosecutor stated he had no further questions. Thereupon both petitioner's and the Rosenbergs' counsel announced "no cross-examination." Government Exhibit 16 had not yet been offered. First Dr. George Bernhard testified and he was followed by William Danziger.[62] Not until after they testified was government Exhibit 16 offered and received in evidence.[63] Thus it could not have played the slightest part in the decision not to cross-examine Gold.

 *Second:* Petitioner next claims that Gold committed and the government suborned perjury and suppressed evidence which allegedly establishes Gold's perjury and would have impeached his testimony as to the June 3 incidents. Petitioner relies in the main upon recorded discs of interviews between Gold and his court-assigned counsel; also an extensive statement dated October 11, 1950, after he had pleaded guilty, which Gold sent from prison to his lawyers.[64]

The tape recordings and the October 11, 1950 letter to his lawyers were, of course, protected by the lawyer-client privilege, and afford no basis for charges of government suppression of evidence upon the trial assuming for the moment, as petitioner contends, they support his charges of perjury. However, with Gold's consent, the recordings and other statements to his lawyers were delivered to the FBI on October 21, 1953, two and a half years after the trial.[65] Petitioner urges the government is chargeable with prior knowledge of the contents of these statements, since he asserts similar statements were made to agents of the FBI, both before and after the appointment of counsel; moreover, he claims that once the government did obtain the lawyer-client statements late in 1953 they should have been made available to petitioner in connection with his post-conviction applications.

The circumstances surrounding those statements are of some importance. Agents of the FBI first interviewed Gold on May 15, 1950, and, as he told his counsel on June 1, from this interview Gold felt they had sufficient information "to convict him, of conspiracy at least, in connection with the Fuchs

---

62. Record, pp. 848–867.

63. Id. at 867–869.

64. The recorded discs, a complete transcription based upon taped recordings of these, and a transcription of excerpts therefrom were submitted. The October 11, 1950 statement, entitled "The Circumstances Surrounding My Work as a Soviet Agent—A Report" (hereafter cited October 11 Statement), is an amplification of a prior, July 20, 1950, statement. (The July 20 statement was not submitted.) The October 11 statement contains an account of Gold's motivation in becoming a Russian spy, biographical matter and details of his espionage activities, including references to the June 3, 1945 meetings with the Greenglasses at Albuquerque. In addition to these two items, petitioner relies upon: A 2-page listing by Harry Gold of interviews had with FBI agents during the period May 22, 1950 and July 19, 1950; An 8-page handwritten statement of Harry Gold entitled, "Chronology of Work for the Soviet Union," the first five pages being dated June 15, 1950, the last three pages being dated June 16, 1950; Letter from John D. M. Hamilton to H. M. Harzenstein of the Federal Bureau of Investigation at Philadelphia, turning over thirty-three discs and other matter; a portion of page 6 of a letter of John D. M. Hamilton, dated September 30, 1960, setting forth the hours spent by Gold with the FBI during 1950–1955; A Letter from James V. Bennett, Director of Bureau of Prisons, to John D. M. Hamilton, dated July 11, 1955.

65. Certiorari had been denied on October 13, 1952, Rosenberg v. United States, and rehearing denied on November 17, 1952, 344 U.S. 838 and 889, 73 S.Ct. 20 and 134.

case." [66] On May 21 he submitted to voluntary custody, and on the 22nd and 23rd confessed to espionage activities over an eleven-year period. But, as Gold later wrote, during these first days he sought to limit his confession to that which he thought the FBI already had knowledge of, his relationship with Klaus Fuchs, and to cover up the identities of others with whom he had espionage transactions. [67] In his effort not to inform on others, as he was later to acknowledge to his attorneys, he resorted to lies and evasions, but was aware that "even while endeavoring to cover up * * * I amazedly found myself irresistibly revealing more and more of the true facts." [68] The final decision to make a full and complete confession of his work as a courier in the Soviet spy system was greatly influenced by the fact that his father and brother, to whom he was deeply devoted and who were in disbelief that he was in any way implicated in any crime, were about to mortgage their home and go into debt for his defense. [69] Thereupon, on June 1, 1950, he accepted court-assigned counsel upon condition that he be permitted to tell the entire story to the FBI, and that counsel "must agree to let me plead guilty, because I was." [70]

On June 1 Gold met briefly with his court-appointed counsel. Upon Gold's insistence that he wished to plead guilty, his lawyer emphasized that any hope for leniency required that he not withhold important information from the FBI. Gold thereupon talked with an FBI agent out of counsel's hearing, and counsel's contemporaneous understanding was that Gold gave him "information about several other people * * * who had

important places in the picture." [71] Gold's subsequent written statement of October 11, 1950 to his lawyer states he, on this occasion, told the agents of the FBI of the events of June 3, 1945 at Albuquerque and the Greenglass' involvement. [72]

Thereafter Gold and his counsel had four recorded interviews in June 1950 and one in August at Holmsburg Prison. At the first, on June 6, Gold's counsel advised him that the purpose of the interviews was to obtain an entire picture so as to present all ameliorating circumstances to the court at the time of sentence. To this end counsel suggested that the interviews "be broken into three sections": first, and to counsel most important, Gold's "life, irrespective of this offense," including his family, education and work, "leaving out all these other matters"; second, the charges and the facts he had given the FBI; and third, his philosophy and motives. [73] The interviews, accordingly, followed this pattern.

The remainder of the June 6 interview and a portion of the next, June 8, were taken up with matters not here relevant. Midway through the June 8 interview Gold commenced telling "everything, *at least in substance*, that * * * [he had] told the FBI." [74] [Emphasis supplied.] In the chronological sequence of his espionage activities Gold mentioned the trip to Santa Fe and Albuquerque, New Mexico on June 2 and 3, but elaboration was postponed for the next interview, which took place on June 14, 1950. At this June 14 interview Gold told his attorneys about his trip, at the direction of "John," to Santa Fe and Albuquerque over the weekend of June 2–3, 1945, and

66. Transcript of Tape Recordings, June 1, 1950, Reel 1, p. 6.

67. October 11 Statement, published in 1956 as part of a Senate Internal Security Subcommittee Report, 84th Congress, 2d Session, p. 1083.

68. Id. at 1084.

69. Ibid.

70. Ibid. See also Transcript of Tape Recordings, June 1, 1950, Reel 1, p. 6.

71. Transcript of Tape Recordings, June 1, 1950, Reel 1, p. 8.

72. October 11 Statement, op. cit. supra note 67, at 1085.

73. Transcript of Tape Recordings, June 6, 1950, Reel 1, pp. 15 and 17.

74. Transcript of Tape Recordings, June 8, 1950, Reel 2, Side 2, p. 16.

of his call on the "GI" in Albuquerque. He recited his unsuccessful efforts on the night of June 2 to contact the Greenglasses; his meeting with them the next morning; a verbal name identification; the afternoon meeting; the receipt of atomic energy information; the delivery of the $500. In substance his statement to his lawyers at the June 14 interview closely parallels his trial testimony. However, certain details to which he testified upon the trial were omitted, and in one instance there is an alleged contradiction. He did not mention the Greenglass name or address, but only referred to the GI and his wife.[75] He did not mention a piece of a cardboard box as the identification signal.[76] He did not mention "Julius" as the recognition signal; he said, "Bob sent me or Benny sent me or John sent me or something like that."[77] He did not mention Rosenberg's name, address or telephone number.[78] He said he checked his bag at the railroad station.[79] He did not mention registration at the Hotel Hilton.[80] He said Yakovlev told him there wasn't much point in getting in touch with the GI, whereas upon the trial he testified that Yakovlev said the information was very valuable.[81]

75. Although Gold did not then recall the Greenglass name, he was able to direct the FBI to the house where they met, to describe roughly the appearance of both Ruth and David, to recall David was a GI, that Ruth had only recently come to Albuquerque, and to identify David as the GI, photographically, although he had aged and put on considerable weight. Transcript of Tape Recordings, June 14, 1950, Reel 5, pp. 37–44. It appears that as a result of data, description and information given by Gold to the FBI, Greenglass was identified and arrested on June 15, 1950.

76. The recordings indicated that he would have omitted mention also of the verbal recognition signal had his lawyer not expressly inquired. Id. at 40.

77. Listening to the passage in context, which reads, " * * * [W]hile this is not the exact recognition sign, I believe that it involved the name of a man and was something on the order of Bob sent me or Benny sent me or John sent me or something like that," it is clear that "Bob, Benny or John" were offered to explain the nature of the recognition sign and that a man's name was involved. Recorded Sound Disc No. X–23, Soundscriber Locator 5–6, June 14, 1950.

78. Gold did, however, say that the GI told him he "expected to have a furlough about Christmas of 1945, and he gave me the name or—and the address, or much more likely, just the name and the telephone number of, I think, his father-in-law or possibly an uncle of his who lived somewhere in the Bronx of New York." Transcript of Tape Recordings, June 14, 1950, Reel 5, p. 41.

79. Gold, upon the trial, gave no testimony at all as to his baggage. The June 3 registration card has no entry under the legend "baggage."

80. However, in his June 14 recital to his lawyer of efforts to identify the GI and where the June 3 meetings took place, among other matters he stated, "I have looked at dozens of reels of motion pictures, *starting with the Hilton Hotel* and going all the way past undoubtedly the street where this GI lived." [Emphasis supplied.] Transcript of Tape Recordings, Reel 5, p. 43.

81. It is not altogether clear from the record that in fact this is a contradiction. At trial, Gold testified that in June 1945, Yakovlev told him that the information received from Greenglass had been very valuable [Record, p. 831], but that in November 1945, when Gold expressed a desire to meet with Greenglass or Rosenberg, Yakovlev told him to mind his own business and "cut me very short." [Record, p. 839.] In the October 11 Statement, op. cit. supra note 67, at 1085, apparently referring to the November meeting, Gold stated that Yakovlev had "subsequently—and with intent to mislead—told me that the information received was of no value." Describing these events to his counsel [Transcript of Tape Recordings, June 14, 1950, Reel 5, p. 42], Gold said that the trip to New Mexico ended the episode. "I never made any attempt to see him [Greenglass] again. I turned the information over to John. John never mentioned anything about it [apparently referring to further meetings between Greenglass and Gold] and on the one occasion when I did mention this man [Greenglass] sometime in the late fall of 1945 [the November meeting], John had said that we can forget all about him, that there wasn't much point in getting in touch with him. And

Primarily, on the basis of the foregoing, Gold is accused of perjury and the government of suborning perjury and suppressing evidence. Considering the purpose and circumstances of the taped interviews, the omissions are of no special significance. And any delay in mentioning the June 3 Albuquerque incidents and the GI is accounted for by the chronological pattern of the interviews. Gold was recounting to his lawyer in compressed form, "at least in substance," the information he had related to the FBI over an extended period.[82] The lawyers' and the FBI inquiries were not on parallel courses. The nature of each inquiry was different. His counsel were seeking the substance of information furnished the FBI in order to present a plea in mitigation of the offense. The FBI was seeking minutiae of detail, leads and data to be investigated and verified. Further, when Gold finally decided to cooperate fully he was faced with the task of dredging his memory as to people, events and incidents spanning a decade of intrigue; the Greenglass incident itself occurred five years earlier. The recordings evince a clear purpose on the part of Gold and the FBI to avoid faulty accusations—as Gold put it, "* * * bending over backwards in an effort not to do so." The check of his information and details involving others was time consuming.[83]

I got from the manner in which he made the remark that apparently the information received had not been of very much consequence at all and that they believed that the risk attendant upon seeing him did not make any such effort worthwhile." Thus it is not clear from the June 14 recording and the October 11 Statement whether Gold was relating to his lawyers what Yakovlev told him at the June meeting, or the subsequent one in November when Gold believed Yakovlev intended to mislead him. Even assuming that there is an inconsistency, it relates solely to the question whether Gold, in his pretrial statements, had mentioned Yakovlev's characterization of the information as valuable, and lends no support to petitioner's allegations of perjury.

82. By June 14, the third interview with his lawyers, Gold had been interviewed for approximately 90 hours by agents of the FBI. "A 2-page listing by Harry Gold of interviews had with FBI agents during the period May 22, 1950 and July 19, 1950."

83. A typical example: With reference to his efforts to identify the GI involved in the June 3 incident (later identified as Greenglass), Gold told his lawyers one day before Greenglass' arrest:

"I have—would like to state one more thing. I have gone over and I have drawn a map of the area as well as I know. I have looked at maps of Albuquerque. I have looked at dozens of reels of motion pictures, starting with the Hilton Hotel and going all the way past undoubtedly the street where this GI lived.

"I have described in detail the approach to the house. I have described the appearance of the house from the outside. I have described the appearance of the porch, the appearance of the steps leading up to the apartment, the appearance of the apartment. I have described the appearance of the old man whom I saw that evening, and I believe I have identified him. I have even succeeded in picking out what I believe to be the correct house, even though the house was subsequently altered after '45 and the porch no longer existed but had been turned into a living room.

"And I believe that we had succeeded in identifying the person who was this GI. Our difficulties concerned—he has put on, if it is the man, he has put on over thirty pounds. His wife has, who was only a girl and a very recent bride, has undoubtedly had a child or two and has matured considerably in appearance. But there are still many circumstantial factors which would lead us to believe that the man we have finally selected is the one.

"However, I would like to emphasize one point, and that is that I have been very careful, and so have the people from the FBI, in attempting to put the finger on a man merely to be able to do so, and that we are, if anything, bending over backwards in an effort not to do so. For instance, I looked at the pictures of several men before I finally picked out from them the one old man who I believe lived in the home at that time." Transcript of Tape Recordings, June 14, 1950, Reel 5, pp. 43–44.

The procedure followed to enable Gold to recall David Greenglass' name is described in the October 11 Statement, op. cit. supra note 67, at 1085.

A careful reading of the transcripts of the recordings and all other material, rather than supporting petitioner's charges, strongly corroborates Gold's trial testimony. The substance of Gold's statement to his lawyer on June 14, one day before Gold's arrest, is essentially the substance of his trial testimony; the major events, times, places and persons correspond. The pretrial statements, recorded or written, are as fully inculpatory of the Greenglasses as is Gold's trial testimony. The omissions and the claimed contradiction do not undermine the fabric of essential matters. The omissions, in the light of the limited purpose of his lawyers' inquiry were not material thereto. The omissions and the claimed inconsistency, themselves explained in the very statements submitted by petitioner.[84] do not even approach supporting the charge of perjury—much less the charge of government participation therein.[85]

*Third:* This is not to say, however, that contradictory statements or omissions could not have been used upon the trial in an effort to undermine Gold's testimony. But no request was made for such statements, and as already noted, cross-examination was waived.

Petitioner now asserts that he and his counsel were unaware until recently of the existence of prior statements,[86] suggesting that such knowledge would have led trial counsel to cross-examine. But again the record contradicts the assertion. Counsel knew of Gold's background and activities. He was not a surprise witness suddenly called to the stand. Counsel knew that Gold was a self-confessed spy; that he had been interviewed extensively by agents of the FBI; that he had been cooperative with the authorities; that he had testified before grand juries; that five months before the trial of this case he had testified as a prosecution witness at the Brothman trial[87] in this district; that in the latter case, in which he was named as a co-conspirator on a charge of conspiracy to obstruct justice involving the giving of false testimony before a grand jury, Gold admitted he had lied before the grand jury; that his disclosure of his espionage activities had engendered great publicity.[88] There was ample basis on these matters alone for defense counsel to have undertaken a searching cross-examination in an attack upon Gold's credibility. Yet no request was made for pretrial statements, grand jury minutes, his trial testimony at the Brothman case (a matter of public record), or any other impeaching material. Trial counsel knew how to get impeaching matter within the then existing requirements.[89] They succeeded in obtaining Elitcher's statements to the FBI and his grand jury testimony,[90]

---

84. See nn. 75–81 supra. Petitioner refers to and indicates there were available to him an excerpt from a statement given by Gold to the FBI on May 22, 1950; a 26-page statement in Gold's handwriting dated July 20, 1950; a 76-page statement in Gold's handwriting dated October 23, 1950, and other documentary material. However, these were not submitted.

85. Cf. Edwards v. New York, 76 S.Ct. 1058, 1 L.Ed.2d 17, 21–22 (1956); Price v. Johnston, 334 U.S. 266, 290–291, 68 S.Ct. 1049 (1948); United States v. Abbinanti, 338 F.2d 331, 332 (2d Cir. 1964); Burns v. United States, 321 F.2d 893, 896–897 (8th Cir.), cert. denied, 375 U.S. 959, 84 S.Ct. 448, 11 L.Ed.2d 317 (1963); Enzor v. United States, 296 F.2d 62, 63 (5th Cir. 1961), cert. denied, 369 U.S. 854, 82 S.Ct. 940, 8 L.Ed.2d 12 (1962).

86. Gold's October 11, 1950 Statement, op. cit. supra note 67, upon which petitioner relies in part, became a public document in December 1956, when it was issued by the Senate Subcommittee on Internal Security, before which Gold had testified. In December 1956 petitioner was represented by three of his present counsel.

87. United States v. Brothman, S.D.N.Y., 133–106 (1950). Trial Transcript, pp. 199, 643–45, 650, 681–82, 748, 836.

88. Record, pp. 568–70, 836, 981 and 1019.

89. Record, pp. 288, 373–74. See United States v. Krulewitch, 145 F.2d 76, 78–80, 156 A.L.R. 337 (2d Cir. 1944).

90. Record, pp. 430–31.

and sought to lay a foundation for Greenglass' prior statements.[91]

The decision not to cross-examine, joined in by petitioner's counsel, was not inadvertent; it was deliberate. The Rosenbergs' counsel in his summation told the jury: "[Gold] got his 30-year bit and he told the truth. That is why I didn't cross-examine him."[92] The thirty-year "bit" was the maximum prison term authorized under the then existing Espionage Act.[93] Thus, there was no basis for effective cross-examination upon a claim that Gold's testimony was motivated by considerations of sentence. Further, defense counsel appraised Gold as "a very, very bright and intelligent person."[94] These factors and a reading of his testimony, which is indeed impressive, suggest the reason counsel decided not to question him; cross-examination could well have served only to expand and emphasize the force of his testimony. That the decision was carefully weighed appears from the same counsel's acknowledgment on the first section 2255 motion that it "was a calculated judgment on * * * [his] part which involved certain risks which * * * [he] accepted."[95] It is somewhat late in the day now to fault counsel for judgment on trial strategy.[96] Clearly this is an attempt by petitioner to make the Jencks Act retroactive to 1951. Petitioner at his trial had a full opportunity, in consonance with the existing procedure, to obtain all pretrial material, but by deliberate choice waived it.

 Strictures, sometimes direct and sometimes oblique, are levelled against the trial attorneys, who continued to represent petitioner and his codefendants in several of the post-conviction proceedings, although the force of criticism is sought to be attenuated by further allegations that counsel were "misled," "deceived," "trapped," "coerced" and "intimidated" by governmental fraudulent conduct. These lawyers are no longer here to defend their professional conduct. But their defense is contained in the files of the vigorously contested trial, appellate and collateral proceedings. The case, which has been "scrutinized with extraordinary care"[97] and has had "painstaking consideration"[98] by each of the Justices of the Supreme Court, afforded ample opportunity for judgment of the lawyers' competency and whether they measured up to the task at hand. They were adjudged "highly competent and experienced."[99] "singularly astute and conscientious,"[100] and "lawyers who have ably and courageously fought the Rosenbergs' battle."[101] Nothing now asserted by petitioner or his present counsel warrants any change of judgment as to his (or the Rosenbergs') lawyers' professional competency in defending him.

In conclusion, the court, with respect to all charges, finds that petitioner was competently represented by counsel; that he has failed to sustain his charges; that the files and records of the case conclusively show that he is not entitled to relief, and that no act or conduct on the part of the government deprived him of a fundamentally fair trial.

The motion is denied in all respects.

91. Record, pp. 587, 613.

92. Record, p. 1479.

93. In 1954 the distinction with respect to the penalty in time of war was eliminated; violation at any time was made punishable "by death or by imprisonment for any term of years or for life." 68 Stat. 1219 (1954).

94. Transcript of Argument, November 28, December 1, 2, 1952, p. 105.

95. Id. at 107.

96. See United States v. Garguilo, 324 F.2d 795, 796–797 (2d Cir. 1963); United States v. Gonzalez, 321 F.2d 638 (2d Cir.

1963); Frand v. United States, 301 F.2d 102 (10th Cir. 1962); United States v. Duhart, 269 F.2d 113, 115 (2d Cir. 1959).

97. United States v. Rosenberg, 195 F.2d 583, 590 (2d Cir. 1952).

98. Rosenberg v. United States, 346 U.S. 273, 293, 73 S.Ct. 1152 (1953).

99. United States v. Rosenberg, 195 F.2d 583, 593 (2d Cir. 1952).

100. Id. at 596, n. 9.

101. Rosenberg v. United States, 346 U.S. 273, 292, 73 S.Ct. 1152 (1953).