**UNITED STATES of America,**
**Appellee,**

v.

**Harry ROBBINS, Appellant.**

**No. 258, Docket 29183.**

United States Court of Appeals
Second Circuit.

Argued Dec. 10, 1964.

Decided Jan. 12, 1965.

Pierre N. Leval, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Charles A. Stillman, Asst. U. S. Atty., on the brief), for appellee.

David E. Lubell, New York City, for appellant.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge:

After a jury trial, Acorn Industries, Inc., and Harry Robbins, its president, were convicted on four counts of an indictment charging violations of the criminal provisions of the Federal Bills of Lading Act, 49 U.S.C. § 121.[1] The first three counts alleged that the defendants, knowingly and with intent to defraud,

---

[1] The corporation, which was bankrupt at the time of sentencing, was fined $1 on each count. The appellant, Robbins, was sentenced to six months' imprisonment on the first count and to two years on the second, execution suspended but probation imposed for two years to commence at the expiration of the sentence imposed on the first count. Imposition of sentence on counts three and four was suspended, and Robbins was placed on probation for a period of two years to run concurrently with the probation on the second count.

aided in uttering three falsely-made and forged bills of lading purporting to represent goods received for shipment in interstate or foreign commerce; the fourth count charged a fraudulent transfer for value of a bill of lading known to contain a false statement. Robbins alone appeals, contending that the evidence was insufficient to sustain his conviction, that it was error to admit testimony about similar transactions not named in the indictment, and that the misconduct of the prosecutor warrants a new trial. We affirm his conviction.

The nine-day trial developed the following facts. Robbins was hired in January 1960 to remedy the desperate financial condition of Acorn, a manufacturer under license from MGM Studios of plastic toys, coloring books, paint sets and other promotional materials relating to the movie "Ben Hur." He became the company's president and set out to secure urgently needed funds. To accomplish this he signed a contract in behalf of Acorn with Harris Factors Corp. on July 7, 1960, calling for advances of up to 75% on the company's accounts receivable.

It appears that in compliance with the terms of the factoring agreement, Robbins would go to the Harris offices every Friday with a schedule of specific accounts receivable to which would be attached invoices and bills of lading purporting to evidence sales and deliveries already made to bona fide customers. Harris would then issue its check to Acorn for approximately 75% of the face value of the accounts shown on the schedule and, as is customary with factored accounts, Acorn's customers were notified to pay their invoices directly to Harris. The present prosecution resulted when false statements were discovered in the documents presented to Harris.

The first and fourth counts of the indictment were concerned with a bill of lading allegedly representing a shipment of 612 cartons of plastic toys and paint sets to the Watson Triangle Company of Miami, Florida. This particular document was specifically mentioned in a schedule of accounts receivable submitted by Robbins on July 29 and was relied upon by Harris in issuing a check to Acorn on that date. The Government's evidence established, however, that Watson Triangle had never ordered the goods, no shipment was made on July 29, and when shipment finally was made on August 3, more than 500 of the cartons were empty.

The second count involved a bill of lading, dated August 5, 1960, and presented to Harris for factoring, which purported to cover 700 paint sets shipped to International Games of Canada in New Toronto, Canada. Here it was charged that the customer had ordered the goods, but that the trucker's signature on the bill of lading was forged and that shipment was not made until August 12 when only 150 cartons were sent, with the balance not following until September and October. The bill of lading in the third count, also dated August 5, 1960, covered a shipment of 400 paint sets to Leonard Wasserman, Inc. in Philadelphia, Pennsylvania. In this instance, the Government alleged that no shipment was ever made and that once again the truckman's signature was forged.

In addition, the Government, under the "similar act" doctrine, introduced evidence with respect to four transactions not charged in the indictment. Three of these were intrastate orders included in the schedules presented to Harris during the period covered in the indictment. This evidence, as we shall indicate, was admitted for the limited purpose of establishing that the acts charged in the indictment were committed knowingly and intentionally and were not the result of error or mistake. In these instances the Government established that the documents presented to Harris were fraudulent in one respect or another. Eventually, the irregularities complained of were discovered when one of the purported purchasers, notified of the assignment of accounts, advised Harris that no order had been placed and no monies were owing. When Rob-

bins arrived on August 5 with the usual schedule of accounts receivable and accompanying documents required for factoring, Samuel Harris, the factor's president, reported this incident to him, refused to factor the accounts presented and proposed instead that he and Robbins call all accounts for verification. Harris then telephoned several accounts in Robbins' presence and learned from them that goods had not been ordered and would be refused. Robbins then admitted that "the receipts are fictitious" and promised, "I will definitely replace it during the week, and I want you to come down to my office daily until such times as I give you other invoices and bills of lading to cover the various schedules."

## I.

At the trial the defense did not deny that the bills of lading were falsely made and forged. Rather, its strategy was to defend on the ground that (a) the inaccuracies were due to negligent methods of operation and inadvertence instead of actual fraud, and (b) even if there was fraud, Robbins had no knowledge of nor responsibility for it.

On this appeal, Robbins contends initially that his guilt was not established beyond a reasonable doubt. This we find to be wholly without merit. If the evidence was sufficient to warrant submission to the jury, it is not the role of appellate judges to weigh the evidence or judge credibility. And, once the jury has rendered its verdict against the defendant we must, in considering the evidence, view it in a light most favorable to the Government. United States v. Kahaner, 317 F.2d 459, 467 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963); United States v. Tutino, 269 F.2d 488, 490 (2d Cir. 1959). With these considerations in mind, we believe that a reasonable juror could have been convinced of appellant's guilt beyond a reasonable doubt.

A brief review of the evidence which has led us to this holding is in order. Acorn's accountant, Milton Berliner, testified that in August 1960 he heard Robbins order an employee to ship empty cartons. Robbins then explained, according to Berliner, that "the reason why he is shipping these empty cartons is because he is desperate and needed the money to carry on his business." It is true that Berliner's testimony was called into question when two witnesses for the defense stated that he had not mentioned this incriminating incident before the trial. But as we have stated, we are appellate judges whose principal function is to determine if prejudicial errors occurred at the trial, and not to retry the facts or to re-adjudicate credibility. The jury must have believed Berliner and we would be improperly invading its sphere were we to resolve this question of credibility independently on the cold record before us. See United States v. Moret, 334 F.2d 887, 891 (2d Cir.1964) (concurring opinion).

Moreover, Berliner's testimony was hardly unsupported. Thus, Harris testified that appellant admitted the receipts were "fictitious" and that he knew "some of the merchandise was no good * * * because he had had no stock." Even if Robbins did not admit that he knew some of the bills of lading covered unordered merchandise, the jury would nevertheless be warranted in inferring that he knew some were inaccurate because empty cartons had been sent to customers.

Finally, there was strong circumstantial evidence from which the jury could have inferred an intent to defraud and knowledge that the bills of lading were false. When Harris demanded that Acorn's officers personally guarantee the factoring agreement, Robbins left the room and soon reappeared with the signature of one Mike Lerner, Vice-President and Sales Manager of Acorn. Since it is not disputed that Lerner was out of town on that date, the circumstances strongly suggest that Robbins either forged or procured the forgery of his signature. In addition, there was testimony that Robbins had spoken with Lerner on several occasions about the problem of selling goods which had been

factored without purchase orders. And, Lerner's possible complicity in the fraudulent scheme does not, *ipso facto*, absolve Robbins, as appellant seems to suggest; nor, does it diminish the sufficiency of the evidence upon which the jury found Robbins guilty beyond a reasonable doubt.

## II.

■ We find no merit in Robbins' claim that the trial court committed reversible error in permitting testimony concerning similar offenses not charged in the indictment. The appellant, in urging this as a ground for reversal, argues that the *only* probative value of this evidence was to show that Robbins had delivered false documents, an issue not in dispute. But, this was not the Government's purpose. It submitted the similarities for the limited purpose of establishing that Robbins *knew* the bills of lading were false and *intended* to defraud the factor, thus negating any inference that the inaccuracies might be due to negligence, mistake, or an innocent state of mind. It is well established that fraudulent intent may be proven by similar, contemporaneous false representations. 2 Wigmore, Evidence §§ 302, 321(c) (3d ed. 1940); McCormick, Evidence § 164 (1954); United States v. Blount, 229 F.2d 669, 671 (2d Cir.1956); see United States v. Rosenblum, 339 F. 2d 473 (2d Cir.1964).

The rule which permits the introduction of evidence respecting similar offenses for this limited purpose is based on the sound recognition that when there exists a pattern of misrepresentations, closely related in time and subject matter, it is reasonable to believe that they were not made innocently. As Wigmore so succinctly wrote, "The argument here is purely from the point of view of the doctrine of chances,—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all." 2 Wigmore, Evidence § 302.

Furthermore, Judge Bryan carefully charged the jury on the "very limited purpose" for which the evidence of similar transactions was admitted. It is significant that no exception was noted to this portion or any other part of the court's instructions.

## III.

■ The appellant also urges that a new trial should be granted because he was seriously prejudiced by the lack of opportunity to question a Government witness who was present when he was alleged to have made his incriminatory admission to Berliner. The witness, Marvin Meyer, a former Acorn employee, testified early in the trial and then returned to California; the prosecutor did not question him about the alleged admission. But after Berliner's testimony, when the importance of such an inquiry was spotlighted, Robbins did not request the prosecutor to secure Meyer's return, did not attempt to subpoena the witness, nor did he suggest that any further testimony by Meyer might be helpful or necessary. Indeed, Meyer's failure to return for further testimony was raised for the first time in motions months after the trial. Cf. United States v. Guerra, 334 F.2d 138, 142 (2d Cir.1964); United States v. Romano, 330 F.2d 566 (2d Cir.1964). His counsel now candidly admits that an error was made by him at the trial in not seeking Meyer's return but he asks us to overlook, in the interest of justice, this failure on his part. Even were we inclined to excuse what counsel characterizes as "a mistake," we do not believe that Meyer's failure to return to the stand would warrant a new trial. And, if Robbins' rights had been preserved, there would be no basis for finding prejudicial error because it appears that Meyer heard only part of the incriminating conversation, and we have nothing before us to indicate that he would have contradicted Berliner. Moreover, apart from Berliner's testimony, there was sufficient additional evidence to establish Robbins' intent to defraud.

## IV.

Finally, we turn to appellant's contention that he is entitled to a new trial because of the alleged misconduct of the Assistant United States Attorney in asking certain questions solely to create unwarranted innuendoes from the questions themselves. Although we would not hesitate to condemn any effort by a prosecutor to inflame jurors by asking questions prejudicial in nature with no factual basis whatever on his part for believing the questions to be well-founded, cf. Michelson v. United States, 335 U.S. 469, 481, 69 S.Ct. 213, 93 L.Ed. 168 (1948), we do not find such misconduct here. Robbins directs us to a series of questions, addressed to him and other witnesses, implying that he had withdrawn substantial amounts from the Acorn account on the same day checks were received from Harris and deposited in the account. But we note that the trial judge called a halt to the questioning when the Government conceded that the withdrawals did not exceed Acorn's normal business needs and Judge Bryan simultaneously informed the jury that no further inquiry would be permitted on this score. We need not decide whether the Government was justified in proceeding on this line of inquiry in order to show Acorn's poor financial plight and thereby suggesting a motive for resorting to fraud to obtain quick cash. See United States v. Houlihan, 332 F.2d 8, 14–15 (2d Cir. 1964). For, even if it was improper, the failure of appellant's experienced counsel to seek additional protective instructions or to move for a mistrial indicates to us that he did not consider the matter prejudicial at the time. See United States v. Kahaner, 317 F.2d 459, 478–479, 482 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

And, here too, if counsel had preserved appellant's right to raise this issue on appeal, there would be no basis for finding reversible error. The isolated instances to which he points cannot be equated with the egregious, repetitive acts of misconduct by the prosecutor in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Moreover, the appellant has read unwarranted innuendoes into the questions. We do not believe that the questions suggested that Robbins had acted improperly and his plausible explanation that the money was needed to meet weekly obligations was quite satisfactory and believable. It does not behoove us to say that the trial judge, whose conduct throughout the trial was manifestly fair and who heard the various questions in their crucial context and observed the jury's reaction, erred in determining that the claimed misconduct was not prejudicial.

Similarly, the prosecutor's inquiries as to whether Robbins practiced handwriting do not warrant a new trial. When the strong likelihood that Robbins was responsible for forging Lerner's signature on the factoring agreement is coupled with the repeated forgeries of the truckman's signature on bills of lading we cannot say that these questions were groundless or intended solely to hurl improper innuendoes at the jury. In this instance too, the defendant failed to move for a mistrial and did not request any special instructions to the jury. Moreover, the prosecutor dropped the inquiry as soon as the trial judge indicated that the form of his question might be objectionable.

The judgment of conviction is affirmed.