**UNITED STATES of America,**
**Plaintiff-Respondent,**

v.

**James Vincent KEOGH, Defendant-**
**Petitioner.**

**No. 61 Cr. 1113.**

United States District Court
S. D. New York.
July 14, 1967.

Robert M. Morgenthau, U. S. Atty. for the S. D. of New York, New York City, for United States.

James J. Featherstone, Alan L. Adlestein, Mark W. Perrin, United States Dept. of Justice, of counsel.

Philip Handelman, New York City, for defendant-petitioner. Arthur H. Sobel, Peter Eikenberry, New York City, of counsel.

## OPINION

WEINFELD, District Judge.

■ Petitioner, James Vincent Keogh, and two codefendants, Elliott Kahaner and Antonio Corallo, were convicted in 1962 of conspiracy to obstruct the due administration of justice. The judgment of conviction was affirmed upon appeal,[1] and certiorari denied.[2] Keogh now seeks a writ of error coram nobis[3] to vacate the judgment of con-

---

1. United States v. Kahaner, 317 F.2d 459 (2d Cir. 1963).

2. 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963).

3. Since petitioner is no longer "in custody" under the judgment of conviction now challenged, his application is treated as one for a writ of error coram nobis under the all-writs section of the Judicial Code, 28 U.S.C. § 1651(a). United States v. Morgan, 346 U.S. 502, 506–11, 74 S.Ct. 247, 98 L.Ed. 248 (1954); United States v. Garguilo, 324 F.2d 795 (2d Cir. 1963).

viction and for a new trial upon the grounds that the prosecution knowingly (1) suppressed exculpatory evidence, and (2) used and sponsored perjured testimony.

Familiarity is assumed with the summary of evidence in the Court of Appeals' opinion affirming the conviction.[4] Briefly, the principal government witnesses were Robert M. Erdman, petitioner's friend and doctor, and Sanford J. Moore, two codefendants as to whom the indictment was severed. Moore testified that he paid $35,000 corruptly to influence a criminal proceeding in the Eastern District of New York wherein he was charged with other officers and employees of Gibraltor Amusements, Ltd. with concealment of its assets in a bankruptcy proceeding in that district.

Erdman testified that he was the conduit through whom the moneys paid by Moore were delivered to Keogh and Kahaner; that Kahaner, on February 23, 1961, and again around March 7, received cash payments of $5,000 each; that Keogh received $5,000 on or about March 7, and $17,500 on March 29.

Moore testified that on March 29, the day before the sentencing of Moore and others in the concealment of assets prosecution, he met Erdman with $20,000 in cash, the balance of the $35,000 bribe. Moore then testified, as did Erdman, that he, in Erdman's presence, delivered $2,500 to Kahaner; that immediately thereafter he accompanied Erdman, who had earlier been given the balance of the $20,000, to the Supreme Court, Kings County, where Erdman entered the courthouse, stating he was going to give the money to Keogh. Erd-man testified he went to Keogh's chambers, where he gave him the envelopes containing $17,500 received from Moore, this being the second payment to Keogh. In addition to Moore and Erdman, six others, who were named as co-conspirators, testified to matters which spelled out the corrupt arrangement. Petitioner denied he received the $22,500; Kahaner denied he received the $12,500.

Erdman and Moore were subjected to searching and grueling cross-examinations by each defense counsel. Their credibility was attacked and they were bitterly assailed in summation. The court instructed the jury that their testimony was to be viewed with great caution and carefully scrutinized. After further admonitory instructions with respect to the self-confessed participants, the jury was instructed that if it did not believe these witnesses, particularly Erdman and Moore, to acquit the defendants. The jury convicted.

Now, five years later, upon affidavits containing much hearsay, the petitioner makes the conclusory charge that the case against him was "steeped in perjury."[5] Three affiants have been convicted of serious crimes—one, a multiple federal felony offender; another, a former lawyer convicted, upon his plea of guilty, of subornation of perjury;[6] and Moore, the central figure in the concealment of assets case, convicted there upon his plea of guilty. Other affiants include witnesses who testified upon the trial, who give their present recollection of events as to which they then testified, and still others who were not witnesses. Petitioner claims the matter now presented is newly discovered during the disbarment proceedings against him.[7]

This remedy is available only to raise errors "of the most fundamental character." United States v. Morgan, 346 U.S. 502, 512, 74 S.Ct. 247, 98 L.Ed. 248 (1954); United States v. Garguilo, 324 F.2d 795, 796 (2d Cir. 1963).

4. United States v. Kahaner, 317 F.2d 459, 463–67 (2d Cir. 1963).

5. Cf. United States v. Abrams, 357 F.2d 539, 550 (2d Cir.), cert. denied, 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966); Abrams v. United States, 351 F.2d 942, 944 (2d Cir. 1965), cert. denied, 384 U.S. 919, 86 S.Ct. 1364, 16 L. Ed.2d 440 (1966).

6. Transcript of Oral Argument, United States v. Keogh, June 5, 1967, p. 59.

7. He has not, however, submitted on the instant application a transcript of the testimony in that proceeding.

■ This court, having presided over this five-week trial, is in a position to appraise these affidavits ·against the background of the trial testimony.[8] A careful review of all the affidavits, weighed against the trial record and files, demonstrates they do not support the serious charges of constitutional infirmity based upon prosecutorial misconduct; that essentially they are vague and conclusory,[9] interwoven with much hearsay[10] and irrelevant matter,[11] and constitute a palpable attempt to relitigate contested trial issues. The legal insufficiency of the moving papers makes unnecessary consideration of the affidavits submitted by the prosecution staff, who vigorously deny the charges of misconduct. In sum, the moving affidavits fail to give evidential support to the charges of suppression of exculpatory evidence or perjury; they are without the slightest factual basis for the further charge that the government knowingly used, permitted and contrived the use of perjured testimony by Erdman or any other witness. Finally, if petitioner's application is treated as a motion for a new trial on the basis of newly discovered evidence, apart from the fact that such a motion is time barred,[12] measured by either the *Berry* or *Larrison* test,[13] there is no basis for granting a new trial.[14]

## I

The instant petition, in large measure, is a renewal of the attack upon Erdman's credibility—the same attack that was focused upon him during his extended four-day cross-examination and in the bitter denunciatory summations by skillful defense lawyers. But to bring petitioner's claim within the rubric "suppression of evidence," an attempt is made to depict Erdman as mentally disturbed and prone to make false accusations of corruption against public figures, of

8. See Mirra v. United States, 379 F.2d 782 (2d Cir. 1967). Cf. United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

9. Sanders v. United States, 373 U.S. 1, 19–22, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Machibroda v. United States, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L. Ed.2d 473 (1962); Abrams v. United States, 351 F.2d 942, 944 (2d Cir. 1965), cert. denied, 384 U.S. 919, 86 S.Ct. 1364, 16 L.Ed.2d 440 (1966); United States ex rel. McGrath v. LaVallee, 319 F.2d 308, 312 (2d Cir. 1963); United States v. Mathison, 256 F.2d 803, 805 (7th Cir.), cert. denied, 358 U.S. 857, 79 S.Ct. 77, 3 L.Ed.2d 91 (1958); United States v. Pisciotta, 199 F.2d 603 (2d Cir. 1952); United States v. Sturm, 180 F.2d 413, 414 (7th Cir.), cert. denied, 339 U.S. 986, 70 S.Ct. 1008, 94 L.Ed. 1388 (1950); Sobell v. United States, 264 F.Supp. 579 (S.D. N.Y.), aff'd on opinion below, 378 F.2d 674 (2d Cir. 1967).

10. Dirring v. United States, 370 F.2d 862, 865 (1st Cir. 1967); D'Ercole v. United States, 361 F.2d 211, 212 (2d Cir. 1966), cert. denied, 386 U.S. 995, 1032, 87 S. Ct. 610, 758, 17 L.Ed.2d 454, 680 (1967). Cf. United States v. Pisciotta, 199 F.2d 603, 607 (2d Cir. 1952).

11. The petitioner and his counsel, in his brief, refer to matters not contained in the record on this application.

12. A motion for a new trial on the basis of newly discovered evidence "may be made only before or within two years after final judgment." Rule 33, Fed.R. Crim.P. See United States v. Robinson, 361 U.S. 220, 225, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960).

13. See United States v. Costello, 255 F. 2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); United States v. On Lee, 201 F.2d 722 (2d Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953); United States v. Fassoulis, 203 F.Supp. 114 (S.D.N.Y.1962); United States v. Hiss, 107 F.Supp. 128, 136 (S.D.N.Y. 1952), aff'd on opinion below, 201 F.2d 372 (2d Cir.), cert. denied, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953).

14. The affidavits make it abundantly clear that no hearing is required. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946); Lyles v. United States, 272 F.2d 910, 912 (5th Cir. 1959); United States v. Troche, 213 F.2d 401, 403 (2d Cir. 1954); Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633, 638 (1942), cert. denied, 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943). See also Shotwell Mfg. Co. v. United States, 371 U.S. 341, 352–57, 364–65, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963).

which the petitioner was unaware but the government knew and concealed from him.

To support this charge, petitioner submits the affidavit of Joseph Abrams, who was not a witness at the trial. Abrams is a four-time felon, presently serving a five year term for SEC violations. His other crimes include defrauding the Federal Government under a manufacturing contract; income tax evasion, and conspiracy to corrupt a government employee.[15]

The grand jury investigation which resulted in the indictment herein extended to other instances of alleged endeavors corruptly to influence criminal prosecutions in the federal courts.[16] Erdman was questioned before the grand jury about other "fixes" and as to payments or gifts allegedly made in connection therewith. One such matter related to income tax evasion charges against Abrams and a corporation of which he was the principal stockholder.[17] The plot, according to Erdman, contemplated that upon Abrams' plea of guilty he would receive a sentence to run concurrently with one he already was serving for an entirely different crime. Erdman testified that both Keogh and Kahaner

essayed roles in the Abrams affair; that Abrams had paid Kahaner a substantial sum of cash; that he, Erdman, had given Keogh a $4,000 car in 1959, for which he, Erdman, personally paid.[18]

Upon petitioner's trial, Erdman, on direct examination, was not questioned either as to the Abrams or other alleged fixes. Accordingly, upon the government's application, any references thereto were excised from his grand jury testimony and Jencks Act material. Now petitioner presents an affidavit by Abrams, disputing Erdman's grand jury testimony of a "fix" in his case. The claim, as advanced by petitioner's present attorney, appears to be that had Erdman's grand jury testimony as to Abrams [19] been revealed to petitioner and his trial attorney (assuming for the moment they were unaware of the Abrams charges), Erdman could have been subjected to further cross-examination, ostensibly to show that he had a penchant for making such charges and was not to be believed.[20] Obviously Erdman's testimony, to the extent that Keogh was implicated thereby, is not exculpatory, but deeply inculpatory, and had evidence of the Abrams and other alleged fixes been admitted as similar

---

15. See United States v. Abrams, 357 F.2d 539 (2d Cir.), cert. denied, 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966); Abrams v. United States, 351 F.2d 942 (2d Cir. 1965), cert. denied, 384 U.S. 919, 86 S.Ct. 1364, 16 L.Ed.2d 440 (1966); Abrams v. United States, 117 U.S.App.D.C. 200, 327 F.2d 898 (1964) (reversing conviction for evidentiary error, following which defendant pleaded guilty in 1966); United States v. Fabric Garment Co., 262 F.2d 631 (2d Cir. 1958), cert. denied, 359 U.S. 989, 79 S.Ct. 1117, 3 L.Ed.2d 978 (1959).

16. A proper regard for the underlying reasons for grand jury secrecy requires that evidentiary matter not be disclosed except to the limited extent necessitated by petitioner's application. See United States v. Proctor & Gamble Co., 356 U.S. 677, 681–82, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); United States v. Rose, 215 F.2d 617, 628–29 (3d Cir. 1954).

17. The indictment against him was pending in the Eastern District of New York. Another indictment against him and the corporation was pending in this district and was transferred under Rule 20 of the Federal Rules of Criminal Procedure to the Eastern District, where both defendants pleaded guilty.

18. Grand jury testimony, pp. 403–24.

19. Significantly, no claim is made, nor affidavits offered, challenging Erdman's grand jury testimony as to other "fixes." Surely if the court had permitted inquiry on the Abrams matter, which involved a collateral issue, the government would have been justified in offering proof of the other "fixes" testified to by Erdman.

20. But see United States v. Aviles, 274 F.2d 179, 190 (2d Cir.), cert. denied sub nom. Evola v. United States, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960).

acts and conduct on the issue of intent,[21] it would have had a devastating impact. But the government scrupulously refrained from offering such testimony, and now it is taxed with suppression because of the excision of the Abrams "fix" references.

■ That Abrams, in his largely incompetent affidavit,[22] disputes Erdman and denies he participated in a conspiracy to "fix" his income tax evasion case, does not establish that he is telling the truth and that Erdman lied with respect thereto; much less does it permit the inference that Erdman committed perjury when he testified at the trial with respect to the Moore fix. Entirely independent of Erdman's testimony, the ultimate disposition of the Abrams tax case,[23] the undisputed fact that petitioner did receive from Erdman a gift of a car in 1959, and other circumstances which could be deemed corroborative,[24] would permit a fact finder to conclude that Erdman's account of an Abrams fix was not the product of imagination. The government would have been entitled to establish these independent circumstances to support Erdman's testimony had the Abrams fix been inquired into in an effort to impeach Erdman. It taxes credulity beyond the breaking point to accept the utterly extravagant claim of present counsel that any use could or would have been made of the Abrams "fix" material[25]—its only use would have been to open the floodgates of collateral matters, including other alleged "fixes," which would have more deeply engulfed petitioner and his codefendant Kahaner. The fact is that petitioner's former counsel, of considerable expe-

21. See United States v. Klein, 340 F.2d 547, 549 (2d Cir.), cert. denied, 382 U.S. 850, 86 S.Ct. 97, 15 L.Ed.2d 89 (1965); United States v. Robbins, 340 F.2d 684, 688 (2d Cir. 1965). Accord, Peeples v. United States, 341 F.2d 60, 65 (5th Cir.), cert. denied, 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965); Dranow v. United States, 307 F.2d 545, 566 (8th Cir. 1962); Tandberg-Hanssen v. United States, 284 F.2d 331, 333 (10th Cir. 1960); Anthony v. United States, 256 F. 2d 50, 53 (9th Cir. 1958).

22. The Abrams affidavit is replete with disguised hearsay, and is flatly contradicted by another of petitioner's affidavits. Thus it is alleged that one of the prosecuting attorneys, not the one in charge of the prosecution, told Abrams *"the department* had serious doubts about Erdman." (Emphasis supplied.) To the extent that this and other statements in Abrams' affidavit purport to describe the government's appraisal of Erdman's accusations in respect of Abrams, they are inadmissible hearsay. United States v. Santos, 372 F.2d 177, 180 (2d Cir. 1967). Further, *of course, such statements are hearsay* as to what Erdman said and do not establish that Erdman was lying. Similarly, Abrams avers that this same prosecuting attorney stated that one Donohue had told him that he, Donohue, had lied about Abrams at the behest of Erdman. This is hearsay and affords no basis for a hearing. Dirring v. United States, 370 F.2d 862, 865 (1st Cir. 1967); D'Ercole v. United States, 361 F.2d 211, 212 (2d Cir. 1966), cert. denied, 386 U.S. 995, 1032, 87 S.Ct. 610, 758, 17 L.Ed.2d 454, 680 (1967). But over and beyond this, Donohue, whose affidavit has also been submitted, expressly contradicts the hearsay statement Abrams attributes to him, stating: "At the time that I have [sic] contrary information, I actually believed that what I was saying then was the truth * * *." These contradictory allegations submitted by petitioner's affiants are not untypical of others.

23. See Abrams v. United States, 351 F. 2d 942, 943 (2d Cir. 1965), cert. denied, 384 U.S. 919, 86 S.Ct. 1364, 16 L.Ed. 2d 440 (1966).

24. No useful purpose would be served in spreading these matters upon the record. See grand jury testimony, pp. 405–06, 413–14, 418–22, 423 (Erdman); 485–87, 492 (Rayfiel); 547–50 (Maggio); 699–703, 727 (Keogh).

25. The evidence in no respect approaches the kind a prosecutor is bound to disclose. Compare, e. g., Giles v. State of Maryland, 386 U.S. 66, 70–79, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). As our Court of Appeals has stated: "The evidence must * * * be shown to be material and of some substantial use to the defendant." United States v. Tomaiolo, 378 F.2d 26 (2d Cir. 1967).

rience in the trial of criminal cases, was most vigilant in keeping any reference to Abrams or other prejudicial extraneous matter from the jury,[26] as any lawyer worth his salt would have done. When the prosecution was about to offer in evidence Keogh's grand jury testimony, his counsel opposed reading those portions which contained references to Abrams, and the matter was deleted.[27]

The utter speciousness of the present claim that any of the Abrams fix testimony could have been used to advantage in further cross-examination of Erdman is readily exposed. Abrams, among other denials of Erdman's grand jury testimony, swears "[Erdman's] statement that on July 21, 1959 he gave Keogh a car *on my behalf* is pure fiction." (Emphasis supplied.) It was not denied that in July 1959 petitioner did receive a gift of a car from Erdman.[28] Thus, the only disputed issue raised by the Abrams affidavit with respect to the gift is whether it was made "on my behalf." Upon the trial, the gift of the car, as well as other gifts and loans, was admitted in evidence for the very limited purpose of showing the close relationship between petitioner and Erdman. This was over the vigorous protest of defense counsel [29]—indeed it was urged upon appeal as "one of the major errors in this case," [30] requiring reversal because of the danger, despite the court's admonition as to its limited

purpose, that the jury would view the gifts and loans "as evidence of other corrupt endeavors." [31] Now present counsel states he would have probed into the reasons for the gift!

▇ Entirely apart from the foregoing, a realistic reading of the record demonstrates that at the time of trial petitioner was aware of Erdman's accusations in the Abrams affair; further, that he not only knew of Erdman's psychiatric history, but himself had called it to the prosecutor's attention. Petitioner was questioned extensively before the grand jury as to his relationship with Abrams, and specifically whether Erdman had ever asked him "to attempt to extricate Mr. Abrams from his legal difficulties?" [32] After a denial he was asked: "Why do you think that Dr. Erdman would make allegations of payoffs to you in connection with the fixing of the Moore case or *any other case?*" [33] Taken in context, it is clear the "any other case" related, among others, to the alleged Abrams fix, and that petitioner's conduct with respect thereto was within the scope of the inquiry.[34]

Petitioner's explanation as to why Erdman would make accusations of payoffs for "fixes" against him was that Erdman was "currently a patient of a psychiatrist," and that he, petitioner, on occasions over the prior five years had suggested to Erdman "that he ought to

---

26. To cite but one instance: the court excluded a clearly competent conversation because of its extremely prejudicial effect. This related to a "liquor license problem" and to "racketeers" and "underworld" elements. SM 383–91, 575, 659–60. Also, Erdman, under the court's prior instruction to avoid collateral matters of a prejudicial nature, did not elaborate about the circumstances under which the car was given to petitioner in 1959. SM 914–15. ("SM" references are to pages of the typed stenographer's minutes of the trial.)

27. SM 2497, deleting grand jury testimony, pp. 702–16; SM 2505, deleting grand jury testimony, pp. 727–30; SM 2506, deleting grand jury testimony, pp. 731–38.

28. Grand jury testimony, p. 699.

29. SM 2360–61, 3155.

30. See petitioner's Brief on Appeal, p. 55, United States v. Kahaner, 317 F.2d 459 (2d Cir. 1963).

31. United States v. Kahaner, 317 F.2d 459, 471 (2d Cir. 1963).

32. See grand jury testimony, pp. 704–05, 727.

33. Id. at 733.

34. Petitioner, who had consulted one of his attorneys prior to testifying before the grand jury, id. at 671, also stated that, aware Abrams was one of the subjects of inquiry, he had referred to his diaries with reference to a dinner meeting he had with Abrams. Id. at 727.

expose himself to some psychiatric therapy."[35] Thus, petitioner's charge that "the government was aware that Erdman had a psychiatric history but concealed it from defense (see Exhibit 1a)" is refuted by his own grand jury testimony. Moreover, Exhibit 1a, an FBI report of an interview with Erdman's psychiatrist, which the government is accused of suppressing because it allegedly supports petitioner's thesis, quotes the psychiatrist's opinion that there is "nothing apparent in Erdman's mental condition which would cause illusions or would in any way reflect upon the veracity of Erdman or his ability to relate occurrences truthfully or accurately."

Additionally, again contrary to petitioner's allegations, Erdman's alleged psychiatric condition was intensively explored upon the trial;[36] indeed, even Erdman's dreams (also referred to in Abrams' affidavit) were the subject of inquiry.[37] Finally, Erdman offered to waive the confidential privilege and to have his psychiatrist testify,[38] and further, seriously to consider allowing petitioner to examine his psychiatrist's notes after Kahaner and Keogh testified.[39] Neither offer was accepted.

Apart from Keogh's own awareness of the Abrams accusation, it is noted that his trial counsel also represented Abrams in a number of criminal matters, including the income tax evasion case. It is

incredible[40] that Abrams concealed from his attorney that he had been questioned by the authorities with respect to his alleged illicit conduct in the very case wherein this attorney represented him because, as Abrams now asserts, the government agents had pledged him to secrecy (denied by all government agents who interviewed him), a pledge allegedly given not at the time of, but some three months after, his initial questioning.[41] It is not without significance that no affidavit has been submitted by this attorney, nor any explanation for its absence.[42] The claims, based upon Abrams' allegations made with respect to Erdman's credibility, are utterly without merit.

## II

The petitioner next accuses the government of suppression of an FBI report dealing with Erdman's finances. The report indicates that from January through August 1961, based upon an examination of his cash receipts journal, Erdman received from various sources $243,590, which was deposited in his bank accounts. The same report shows that the source of four deposits in February 1961 totalling $15,539 could not be identified by Erdman or his accountant. Erroneously, petitioner alleges that they "equal the total amount of bribes alleged to have been paid to Erdman in February 1961," and concludes this was exculpatory evidence which could

35. Id. at 734.

36. SM 488, 676–79, 877, 1036a.

37. SM 870–71.

38. SM 677. The offer was repeated. SM 679.

39. SM 877.

40. See Machibroda v. United States, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); United States ex rel. Rambert v. State of New York, 358 F.2d 715, 716–17 (2d Cir. 1966); Hartman v. United States, 310 F.2d 447 (6th Cir. 1962); Malone v. United States, 299 F. 2d 254, 256 (6th Cir.), cert. denied, 371 U.S. 863, 83 S.Ct. 122, 9 L.Ed.2d 100 (1962); United States v. McNicholas, 298 F.2d 914, 916 (4th Cir.), cert. de-

nied, 369 U.S. 878, 82 S.Ct. 1150, 8 L. Ed.2d 280 (1962).

41. Also, an FBI report of an interview with Erdman dated August 1, 1961, which was turned over to petitioner under 18 U.S.C. § 3500, clearly disclosed that Erdman claimed "he went to see Keogh on behalf of a friend named Abrams."

42. See Sobell v. United States, 264 F.Supp. 579, 596 (S.D.N.Y.), aff'd on opinion below, 378 F.2d 674 (2d Cir. 1967). See also United States ex rel. Homchak v. People of State of New York, 323 F.2d 449, 450 (2d Cir. 1963), cert. denied, 376 U.S. 919, 84 S.Ct. 677, 11 L.Ed.2d 615 (1964); United States ex rel. Weiss v. Fay, 232 F.Supp. 912, 914–15 (S.D.N.Y. 1964).

have been used to establish that Erdman kept the bribe money—incidentally, somewhat different from his contention upon the trial.[43] The charge rests upon an erroneous premise and disregards basic evidence.

 The four deposits were: February 6, $1,000; February 6, $1,500; February 10, $5,539.94, and February 17, $7,500. Each was a check deposit [44] and recorded in Erdman's receipts journal. The bribe money was cash. Each deposit antedated the first delivery of bribe money to Erdman, which was fixed at the earliest as February 20 by Moore,[45] and February 23, according to Erdman.[46] The bribe money received from Moore in February was $5,000, not $15,000.[47] The second cash payments of $5,000 each were turned over by Moore to Erdman on or about March 7; [48] the final payments of $17,500 and $2,500 were made on March 29.[49] There is no basis for the claim of suppression of exculpatory evidence.[50]

Moreover, upon the trial the petitioner had Erdman's financial records. Erdman consented to an examination of his bank and other records, including a "financial statement or any certified statement or anything like that." [51] Erd-

man's bank records, pursuant to court direction, were turned over to the Clerk of the Court on May 18 at the end of the day's session.[52] At the next court session Erdman and government counsel made it clear that all Erdman's financial records were available for examination. Erdman, more than once, stated he had no objection to petitioner's attorney examining his records, and government counsel agreed.[53] Although Erdman's records were available [54] from May 18,[55] no action was taken until the government rested on rebuttal on June 11, when petitioner's counsel, based on "calculations" derived from Erdman's bank records, statements, check stubs, deposit slips and vouchers, made an offer of proof with respect to cash deposits; [56] but when the prosecutor indicated that if the proffered items were admitted he would recall Erdman to explain them, and although petitioner's counsel was afforded an opportunity to submit a memorandum on the issue, the matter was dropped by the defense and the trial concluded.[57] The record abundantly establishes that there were available to petitioner any and all records required for any purpose relative to the disposition of the cash payments to which government witnesses testified.

43. Keogh and Kahaner took different tacks as to the disposition of the bribe money. See United States v. Kahaner, 317 F.2d 459, 476 (2d Cir. 1963).

44. A possible exception is the $1,000 deposit on February 6, which is not identified as check or cash.

45. SM 1338–42.

46. SM 379–82.

47. See SM 379–82, 1338–42.

48. See SM 402–06, 574, 1209, 1546–49.

49. See SM 412–19, 1216, 1386–91, 1594–95. These three dates were fixed by reference, in the first instance, to the date of indictment, February 24; in the second instance, to the date of pleading, March 9; and in the third instance, to the date of sentence, March 30.

50. Neither the FBI report nor any other exhibit furnishes the dates of these checks. The date of issuance normally precedes the date of deposit, which makes even

more speculative petitioner's claim with respect to the information in the FBI report. As our Court of Appeals has recently held, the prosecutor's duty to disclose evidence does not extend to that which is "wholly lacking in probative force because of its speculative quality." United States v. Tomaiolo, 378 F.2d 26 (2d Cir. 1967). And see n. 25, supra.

51. SM 1018.

52. SM 1020.

53. SM 1036–37, 1128. See also SM 637, 639.

54. Moore likewise consented to turn over all his records, SM 1575–76.

55. No pretrial request for this matter was made. Compare Brady v. State of Maryland, 373 U.S. 83, 84, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

56. SM 3245–51.

57. SM 3253–56.

■ The further claim that government counsel deliberately concealed Erdman's true financial condition by presenting him as a man of substantial means is so shallow as hardly to merit discussion. Apart from the fact that petitioner himself subpoenaed and had available Erdman's bank records, the proof was that his annual professional income alone was about $150,000, hardly suggestive of an impecunious state, and the financial report, allegedly suppressed to conceal his true condition, verifies this. It shows that over an eight-months period Erdman had income from fees of $90,000, and another $35,000 from rents and investments, apart from substantial property interests. Petitioner himself, not once, but many times, vouched that Erdman was a man of substance—corroborated by their personal transactions—and no evidence now presented indicates otherwise.[58]

### III

Petitioner offers the affidavits of three witnesses who testified upon the trial to support his charge that the government suborned perjury. These relate to matters which were litigated upon the trial and reviewed upon appeal. Taken individually or collectively, they simply establish the continued existence of controverted fact issues; in no respect do they permit the inference of perjury, much less provide the slightest basis for any claim of government perfidy.

■ One affiant is Moore, the principal in the Gibraltor case, convicted upon his plea of guilty of bankruptcy fraud. His sentence was reduced from three years to one year in December 1961, six months before the start of the instant trial upon his assurance of continued cooperation with the authorities, he already having testified before the grand jury. The reduction was highly publicized—indeed, it was the basis for not one,[59] but two,[60] motions by petitioner for a severance, and needless to say Moore was subjected to a raking cross-examination as to any promise made or consideration extended to him,[61] although petitioner suggests that it is newly discovered.

A further preliminary word about this affiant. Upon the trial this court declared him a hostile witness because of a substantial shift from his grand jury testimony whereby, contrary thereto, he sought to exonerate the defendant Corallo from participation in the conspiracy.[62]

Moore, in his current affidavit, does not retract his trial testimony of the essential facts of the conspiracy. He does not deny he agreed to pay $35,000 to "fix" his bankruptcy fraud case; he does not deny the delivery of cash to Erdman to carry out the corrupt plot; he does not deny that on the day of final payment he had $20,000 cash; he does not deny that he, himself, in Erdman's presence, paid $2,500 to Kahaner; he does not deny that he gave envelopes containing the balance of the $17,500 to Erdman; he does not deny that when he accompanied Erdman to the courthouse Erdman said he was going to give the cash to Keogh; he does not deny that about May 10 he, Erdman, and Gabe Forman conferred with Keogh at his chambers and discussed possible restitution with reference to a reduction in sentence and the importance of Joseph Jaspan, the attorney for the trustee in the Gibraltor bankruptcy with respect thereto; that thereafter, on May 22, a conference was held at Keogh's chambers, at which restitution was discussed, and that those present included Keogh, Jas-

---

58. Petitioner refers to Erdman's tax returns, but no evidential proof has been offered as to these; moreover, the amount of taxable income is no test of actual income or of capital assets. See, e. g., Cooper v. Hallgarten & Co., 34 F.R.D. 482 (S.D.N.Y.1964).

59. United States v. Kahaner, 203 F.Supp. 78, 80 (S.D.N.Y.1962).

60. United States v. Kahaner, 204 F.Supp. 921, 924 (S.D.N.Y.1962).

61. See SM 1414–18.

62. United States v. Kahaner, 317 F.2d 459, 473 (2d Cir. 1963).

pan, Moore, Erdman and Forman; he does not deny his other significant trial testimony.[63] However, five years after the trial and six years after the events, Moore swears he has a different recollection as to three events, his memory having been refreshed as to one by looking at his lawyer's diary. He now says the date of the final payments totalling $20,000 was not March 29, but March 21. And his lawyer, George Becker, now says that his diary reflects Moore was in his office on March 20, showed him money in two envelopes and said he was going to make the final payment that day,[64] which would take care of his guilty plea.

These affiants have evidently overlooked or forgotten prior testimony, statements or affidavits, some on file in this court and also in the Eastern District, several of which were given three months after the events.[65] Moore, time and time again, on direct and cross-examination, swore that the final payment was made on March 29, the day before the sentence, certainly a day to be remembered.[66] He fixed March 29 because of its relationship to the eventful March 30 date in his life. Becker, before the grand jury, upon the trial, and in statements, swore that Moore showed him the money the last week in March.[67] It would be strange indeed if his diary had not been available to him when he testified at the trial,[68] or when he swore to an affidavit "after he had carefully

reviewed" an earlier statement upon which the affidavit was based.[69]

The next item concerns the meeting held at Keogh's chambers on May 22. Moore testified, as did Erdman, that Keogh struck the last paragraph of a draft of a settlement offer which conditioned payment upon a reduction of sentences imposed upon Moore and his co-defendants on March 30. Keogh denied he struck the paragraph. Joseph Jaspan, who was called to the meeting by petitioner, when questioned about the stricken paragraph, gave no enlightening answer.

The petitioner now charges that:

"The Government refrained from questioning Mr. Jaspan as to who, in fact, struck the last paragraph from this restitution letter. My counsel, obviously, was afraid to ask that question and press for a full and complete answer, lest the answer be harmful to me. * * * The Government's consequent reliance on the testimony of Erdman as to the events of that meeting was a deliberate and knowing sponsorship of and reliance upon perjurious testimony."

This charge has been quoted not only because it is demonstrably baseless, but, typical of others, is in flagrant disregard of the record. The gratuitous slur upon his trial counsel also flies in the face of the record, and to anyone who witnessed this vigorously contested trial, it comes

---

63. For example, he does not retract his testimony as to an inculpatory statement Keogh made at this May 22 meeting. SM 1242–43.

64. This at once appears to contradict Moore's present version that the money was paid the following day, March 21. Moreover, Kerner, Moore's brother-in-law, named as a co-conspirator, testified that 2, 3 or 4 days before March 30, the day of sentence, Moore showed him envelopes containing money for the final payment, and since it was "risky for Moore to walk around with this money, he gave it to me to hold for a couple of days." SM 2071, 2081, 2109, 2112. Kerner's testimony also meets the hearsay affidavit of Lenore Schwach submitted on this motion.

65. See, e. g., Statement by Moore, dated June 29, 1961, p. 12; Statement by Moore, dated July 5, 1961, p. 9; Moore's grand jury testimony, July 12, 1961, pp. 17, 22–23.

66. SM 1216, 1386–91, 1513, 1594–95.

67. Grand jury testimony, p. 152; SM 1962–63.

68. Becker does not now state his diary was unavailable or that he failed to consult it prior to testifying. See n. 40 supra.

69. Statement by Becker, dated July 6, 1961, p. 4; Affidavit of Becker, sworn to July 10, 1961, p. 3.

as a rather remarkable item of intelligence that petitioner's trial counsel ever was afraid to press a witness for fear of an adverse answer, or for any reason.

Jaspan was asked by the government as directly as is possible, "who put those lines through the last paragraph?" [70] to which he replied he thought he had, but wasn't certain. Jaspan, pressed by petitioner's counsel on this point, answered: "Mr. Singer, I can't say to you, as I have said before, I have any recollection of doing it." [71] And Mr. Singer, not satisfied with the response, tried to refresh Jaspan's hazy recollection, but was told, "I have considered this matter and I have given you my best answer." [72] In the face of this questioning separately by government and petitioner's counsel, it defies understanding that either can be seriously charged with dereliction of duty. Yet, petitioner, based upon the Moore and Jaspan affidavits with respect to their trial testimony as to the last paragraph, persists in such a charge. Affiant Jaspan now states: "Although I do not recall who struck it * * * I definitely do recall that Judge Keogh did not strike that paragraph from the letter. Whoever did the physical striking out of that paragraph, it was not Judge Keogh." And Moore, blithely out of hand, states: "I really do not recall why I so testified. I now admit that I have no knowledge whatever of who struck the last paragraph from that letter but I do know that I did not see Judge Keogh do it." And of such stuff the court is asked to find that because Erdman's testimony now stands alone he perjured himself on this issue, and further that the government's reliance on his testimony was a deliberate and knowing sponsorship of perjurious testimony. [73]

The third item as to which Moore now alleges a different version from his trial testimony relates to Exhibit 1, an index card. Erdman testified upon the trial that when he first enlisted Keogh's aid in early March, Keogh discussed his economic condition, expenses at his Great Barrington home, and then gave him the card on which he had listed the cost of items of repair to his home. Petitioner admitted he gave the card to Erdman, but fixed the date as the middle or toward the end of April. [74] Moore testified that Erdman had shown him the card on March 7, when he delivered $10,000 to Erdman at his office. Moore now recalls that he did not see it until late April or early May. Just what brought about this refreshed recollection is not stated. [75]

The fact that Moore, with respect to three items, and Becker and Jaspan, with respect to one, now say they have somewhat different recollections from their trial testimony, does not warrant the inference that Erdman was lying. That each has raised an issue as to his own version does not impugn Erdman's version of those events. [76] Moreover, in no respect does any one of them assert that his trial testimony was knowingly false when given or that this information was imparted to the prosecution.

As to Exhibit 1, petitioner also offers the affidavit of Andrew Euston, his

70. SM 2302.

71. SM 2321.

72. SM 2322–23.

73. The fact is that other events in connection with that meeting, of at least equal if not greater inculpatory significance, testified to by the affiants are not the subject of changed testimony. See SM 1242–43, 2294–95.

74. SM 3069. Before the grand jury Keogh fixed the date as "during the spring of this year." Grand jury testimony, p. 717.

75. Moore does state that during the investigation he was "under great mental strain," and that when he testified he "was confused." However, upon the trial, not once, but several times, he told his cross-examiner, "I have had plenty of time to think in the last few months." E. g., SM 1391, 1505.

76. See Shotwell Mfg. Co. v. United States, 371 U.S. 341, 357, 365, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963).

close friend for over forty years, the architect in charge of the renovation at Great Barrington, who states that the cost estimates were not submitted to Keogh until late April or early May 1961. Euston testified before the grand jury. He was not called to testify upon the trial. Petitioner charges that the government deliberately refrained from questioning Euston before the grand jury as to the dates the cost information was available, and since it failed to call him upon the trial it deliberately fostered perjured testimony—this upon the assumption that Erdman falsified as to the date and Keogh did not.

Euston, when called before the grand jury, contrary to his present affidavit, testified that in *1960*,[77] in consultation with Pasquale Panza, a contractor, he prepared a breakdown of the cost estimates room by room; that these totalled "about $9,000 or $10,000 for everything we intended to do";[78] that sometime thereafter he submitted these to Keogh. Euston was asked specifically: "Do you have a copy of your figures on that?" and he answered, "No," explaining that he was unable to give more precise figures because he had practically no records due to the fact he was doing the job for Keogh as an old friend.[79]

Upon the trial the government pursued the inquiry further. Keogh testified that he might have received the information orally. Upon cross-examination the government pressed him for records or any material[80] which would have revealed the very information it is accused of suppressing. The government requested that petitioner bring the records to court next day. He never did.

And although petitioner disputed the date he gave the card to Erdman, the two men, who presumably had the information or records and were in a position to corroborate petitioner, Euston, his intimate friend, and Panza, the contractor who did the job, were never called by him. Rather strikingly, no affidavit is submitted by Panza,[81] who, it appears from Euston's grand jury testimony, did some part of the work in 1960 and some in 1961.

## IV

And in the final effort to support a charge of perjury and suppression of evidence, petitioner submits two additional affidavits—one by Sheldon R. Kravitz, and the other by Frank Maggio.

Kravitz, a resigned member of the New York Bar, has been convicted of

---

77. Panza testified to like effect before the grand jury, p. 641.

78. See grand jury testimony, pp. 658–59.

79. Id. at 659–60.

80. "CROSS EXAMINATION CONTINUED BY MR. HUNDLEY:
"Q During yesterday's session I asked you if you would search through your records to see if you had any record which would indicate when you were apprised of the precise figures of the cost of the items on Government's Exhibit 1. Did you conduct such a search?
"A Yes.
"Q What did you find, sir?
"A I found the statements of the contractor as confirmed by the architect.
"Q Did they indicate when you were first apprised of the precise figures that you put on this card?
"A No, they do not. It was the final rendering of the bill.

"Q So that let me ask you, then: Has your memory been refreshed by looking through your material as to how you were apprised of what these precise costs would be?
"A No.
"Q Do you feel, perhaps, it was by an oral conversation, then, in view of the fact that you don't have any record?
"A That is right.
"Q Do you recall who told you?
"A The architect, Mr. Euston, on the telephone, because my file doesn't show any correspondence in connection with it.
"Q So you must have had a call from Mr. Euston where he told you that bathroom one would be 2989; the dining room would be 2508, and the closed patio, 1970, and bathroom number two, 1560; isn't that right?
"A That is right." SM 3103–04. See also SM 3069, 3071.

81. See n. 42 supra.

subornation of perjury.[82] He has no personal knowledge of any matter involved in the instant indictment. However, he asserts that one year after the trial, Erdman made vague and conclusory[83] statements to him, namely, that the case "was full of perjury"; that the bribe money could not have gone into a single envelope;[84] that the Essex House telephone conversation never happened "as Moore testified"; that he "mentioned" this to an Assistant United States Attorney, who told him to forget it, and that when he told prosecution officials that he, Erdman, had "facts" indicating Kahaner was in Judge Frank's chambers on March 29, he also was told to forget it.

Kravitz then adds double hearsay by further stating that he met Erdman's wife sometime thereafter, who told him her husband had told her the same thing. Kravitz's hearsay statements, assuming one were called upon to pass upon his credibility, do not qualify as evidential.[85] There is no factual basis for charges of government misconduct predicated upon the Kravitz assertions.

Equally without foundation is the claim of suppression resting upon Maggio's affidavit. Maggio, who was Erdman's "chauffeur, all-around man," testified before the grand jury.[86] He gave no testimony as to anything directly relevant to the indictment charge against petitioner. In response to a direct question, he denied knowledge of any role played by Erdman in seeking to get petitioner to fix cases.[87] He was not called by the government as a witness upon the trial.

Petitioner, however, asserts that by its failure to call him the government suppressed exculpatory evidence and suborned perjury. In support of this charge he relies upon Maggio's current allegations. Before the grand jury Maggio, in addition to his disclaimer of knowledge, testified that Erdman was a "soft touch";[88] that he, Maggio, handled the transaction for the purchase of the car which Erdman gave Keogh in 1959; that he chauffeured Keogh and members of his family in New York City and out of town in Erdman's car; that he brought packages of medicines from time to time to Keogh; that at or about the time of the car purchase he cashed a check for $1,000 drawn by Erdman and observed the latter place the proceeds in an envelope, which he later delivered to Keogh at his chambers.[89] Maggio now avers that "certain statements" to the grand jury about delivering money to Keogh were untrue. However, he does not specify in what respect they are untrue.[90] But in any event, his affidavit provides no basis for a claim of suppression of exculpatory evidence, since no corresponding inculpatory or any other sort of evidence as to the alleged $1,000 cash incident was offered or received in evidence upon the trial. Petitioner not having been inculpated in any way with respect thereto, there was nothing from which he could have exculpated himself.

Maggio also claims, as to this portion of his grand jury testimony, that it was given at Erdman's "suggestion" and that Erdman, in response to questioning by Maggio, acknowledged he was

82. Transcript of Oral Argument, United States v. Keogh, June 5, 1967, p. 59. In July 1964, Kahaner, petitioner's codefendant, based upon a substantially similar affidavit by Kravitz, moved for a new trial, and, upon the return day, consented to its dismissal with prejudice.

83. See n. 9 supra.

84. But see SM 852–66, 963–64.

85. Dirring v. United States, 370 F.2d 862, 865 (1st Cir. 1967); D'Ercole v. United States, 361 F.2d 211 (2d Cir. 1966), cert. denied, 386 U.S. 995, 1032, 87 S.Ct. 610, 758, 17 L.Ed.2d 454, 680 (1967). Cf. United States v. Pisciotta, 199 F.2d 603 (2d Cir. 1952).

86. Grand jury testimony, pp. 546–65.

87. Id. at 564.

88. Id. at 562.

89. Id. at 547–57.

90. See n. 9 supra.

trying to "frame" petitioner. These statements, just as the similar Kravitz allegations previously discussed, are hearsay.[91] But, more important, nowhere does Maggio charge that he communicated this alleged information about Erdman's suggestion and acknowledgment to prosecution officials, and consequently there is no basis for any claim of government participation.[92]

Finally, petitioner contends that the government suppressed the grand jury testimony and statements of Harry Kay, who was not a witness upon the trial. Kay had disappeared in August 1961; efforts by the government to locate him were of no avail, and he has not been found since. Moore, upon the trial, acknowledged that when testifying before the grand jury he had placed Kay at the scene of payment of the $2,500 to Kahaner on March 29, but later corrected it before the grand jury and explained the reasons for his correction.[93] Needless to say, based on Moore's grand jury and Jencks Act statements, he and Erdman were thoroughly cross-examined about this.[94] Kay's statements and grand jury testimony add nothing to what all defendants already knew as to the Kay situation.

### V

The case against petitioner did not, as he suggests, rest solely upon Erdman's word against his; there was, in addition, substantial circumstantial evidence, some of a documentary nature, which gave persuasive support to Erdman's testimony and the jury's acceptance of it.

In conclusion, the court finds that petitioner has failed to sustain his charges, whether singly or in combination, that the jury verdict was the product of perjured testimony; that the prosecution knowingly used, induced or sponsored perjured testimony; that the prosecution suppressed exculpatory or valuable evidence. In sum, no act, conduct or omission on the part of the prosecution in any respect violated the defendant's constitutional rights. He received a fundamentally fair trial. The interest of justice does not require a new trial.

The petition is dismissed.

91. Dirring v. United States, 370 F.2d 862, 865 (1st Cir. 1967); D'Ercole v. United States, 361 F.2d 211, 212 (2d Cir. 1966), cert. denied, 386 U.S. 995, 1032, 87 S.Ct. 610, 758, 17 L.Ed.2d 454, 680 (1967). Cf. United States v. Pisciotta, 199 F.2d 603, 607 (2d Cir. 1952).

92. As to the references to stocks purchased by Erdman in Maggio's name and their financial relationship, these were fully explored upon the trial. SM 1191–92, 1106–10.

93. See SM 1360–70, 1528–29, 1594–95.

94. SM 597–600, 605, 705–08, 1360–70, 1528–29, 1594–95.